UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket Nos. CR09-335 (RJL) |
| | : | CR09-336 (RJL) |
| Plaintiff, | : | CR09-338 (RJL) |
| | : | CR09-340 (RJL) |
| | : | CR09-341 (RJL) |
| v. | : | CR09-342 (RJL) |
| | : | CR09-343 (RJL) |
| AMARO GONCALVES, JEANA | : | CR09-344 (RJL) |
| MUSHRIQUI, JOHN M. MUSHRIQUI, | : | CR09-345 (RJL) |
| DAVID PAINTER, LEE M. WARES, | : | CR09-346 (RJL) |
| PANKESH PATEL, OFFER PAZ, | : | CR09-347 (RJL) |
| ISRAEL WEISLER, MICHAEL SACKS, | : | CR09-348 (RJL) |
| JOHN BENSON WIER, III, HAIM | : | CR09-349 (RJL) |
| GERI, YOCHANNAN R. COHEN, SAUL | : | CR09-350 (RJL) |
| MISHKIN, R. PATRICK CALDWELL, | : | February 17, 2010 |
| STEPHEN GERARD GIORDANELLA, | : | |
| ANDREW BIGELOW, HELMIE | : | 2:50 p.m. |
| ASHIBLIE, DANIEL ALVIREZ, LEE | : | |
| ALLEN TOLLESON, JOHN GODSEY, | : | |
| MARK MORALES, and JONATHAN | : | |
| SPILLER, | : | |
| | : | |
| Defendants. | : | |
| . . . . . . . . . . . . . . . | : | |


TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:          LAURA PERKINS, ESQ.
                            MATTHEW C. SOLOMON, ESQ.
                            1400 New York Avenue, N.W.
                            Third Floor
                            Washington, D.C.  20005

(Appearances continued on the next page.)

APPEARANCES (continued):

For the Defendant Goncalves:   JEREMY D. MARGOLIS, ESQ.
                               ROBERT ANDALMAN, ESQ.
                               Loeb & Loeb, LLP
                               321 North Clark Street
                               Suite 2300
                               Chicago, Illinois  60654


For the Defendant John         DAVID STANLEY KRAKOFF, ESQ.
Mushriqui:                     JAMES T. PARKINSON, ESQ.
                               Mayer Brown, LLP
                               1999 K Street, N.W.
                               Washington, D.C.  20006


For the Defendant Jeana        CHARLES LEEPER, ESQ.
Mushriqui:                     Drinker, Biddle & Reath, LLP
                               1500 K Street, N.W.
                               Washington, D.C.  20005

                               BARRY GROSS, ESQ.
                               One Logan Square
                               Suite 2000
                               Philadelphia, Pennsylvania  19103


For the Defendant David        PETER ROBERT ZEIDENBERG, ESQ.
Painter:                       DLA Piper, LLP
                               500 8th Street, N.W.
                               Washington, D.C.  20004


For the Defendant Lee M.       DANNY C. ONORATO, ESQ.
Wares:                         DAVID SCHERTLER, ESQ.
                               Onorato & Schertler, LLP
                               601 Pennsylvania Avenue, N.W.
                               Washington, D.C.  20004


For the Defendants Pankesh     ERIC B. BRUCE, ESQ.
Patel and Haim Geri:           Kobre & Kim, LLP
                               1919 M Street, N.W.
                               Washington, D.C.  20036


(Appearances continued on the next page.)

APPEARANCES (continued):

```
For the Defendant Offer Paz:    REID HENRY WEINGARTEN, ESQ.
                                BRIAN MATTHEW HEBERLIG, ESQ.
                                Steptoe & Johnson, LLP
                                1330 Connecticut Avenue, N.W.
                                Washington, D.C.  20036


For the Defendant Israel        LISA A. PRAGER, ESQ.
Weisler:                        Wilson, Sonsini, Goodrich & Rosati
                                1700 K Street, N.W.
                                Suite 500
                                Washington, D.C.  20006


For the Defendant Michael       SOLOMON L. WISENBERG, ESQ.
Sacks:                          Barnes & Thornburg, LLP
                                750 17th Street, N.W.
                                Suite 900
                                Washington, D.C.  20006

                                MICHAEL RYAN PATRICK, ESQ.
                                Renzulli Law Firm, LLP
                                81 Main Street
                                Suite 508
                                White Plains, New York  10601


For the Defendant John          BARRY COHEN, ESQ.
Benson Wier, III:


For the Defendant Yochannan     GEORGE ALLEN DALE, ESQ.
Cohen:                          Law Offices of George Allen Dale
                                601 Pennsylvania Avenue, N.W.
                                Suite 900 North
                                Washington, D.C.  20004


For the Defendant Saul          BRITTNEY B. HORSTMAN, ESQ.
Mishkin:                        201 South Biscayne Boulevard
                                Suite 905
                                Miami, Florida  33131
```

(Appearances continued on the next page.)

APPEARANCES (continued):

For the Defendant R. Patrick    ERIC A. DUBELIER, ESQ.
Caldwell:                       Reed Smith
                                1301 K Street, N.W.
                                Suite 1100 East Tower
                                Washington, D.C. 20005


For the Defendant Stephen       PAUL A. CALLI, ESQ.
Gerard Giordanella:             STEPHEN J. BRONIS, ESQ.
                                Carlton Fields
                                100 SE Second Street
                                4000 International Place
                                Miami, Florida  33131


For the Defendant Andrew        CONNIE MEDEROS-JACOBS, ESQ.
Bigelow:                        LAWRENCE JACOBS, ESQ.
                                543 10th Street West
                                Bradenton, Florida  34205


For the Defendant Helmie        EUGENE V. GOROKHOV, ESQ.
Ashiblie:                       Burnham & Gorokhov, PLLC
                                1739 Clarendon Boulevard
                                Arlington, Virginia  22209


For the Defendant Daniel        MICHAEL L. VOLKOV, ESQ.
Alvirez:                        Dickinson Wright, PLLC
                                1875 I Street, N.W.
                                Suite 1200
                                Washington, D.C.  20006


For the Defendant Lee Allen     JOSEPH S. PASSANISE, ESQ.
Tolleson:                       2974 East Battlefield
                                Springfield, Missouri  65804


For the Defendant John          MICHAEL J. MADIGAN, ESQ.
Godsey:                         BREE NICOLAI MURPHY, ESQ.
                                Orrick, Herrington & Sutcliffe
                                1152 15th Street, N.W.
                                Washington, D.C.  20005


(Appearances continued on the next page.)

APPEARANCES (continued):

For the Defendant Mark          STEVEN J. McCOOL, ESQ.
Morales:                        Mallon & McCool, LLC
                                1776 K Street, N.W.
                                Suite 200
                                Washington, D.C.  20006


For the Defendant Jonathan      KENNETH L. WAINSTEIN, ESQ.
Spiller:                        O'Melveney & Myers, LLP
                                1625 I Street, N.W.
                                Washington, D.C.  20006


Court Reporter:                 PATTY ARTRIP GELS, RMR
                                Official Court Reporter
                                Room 4700-A, U.S. Courthouse
                                Washington, D.C. 20001
                                (202) 962-0200


ALSO PRESENT:                   Tammy Everitt, Pretrial Services


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1           P R O C E E D I N G S

2           COURTROOM DEPUTY:  Calling criminal case 09-335, United

3    States of America versus Amaro Goncalves.

4           Would counsel please come forward and identify yourself

5    for the record.

6           MR. MARGOLIS:  Good afternoon, your Honor.  Jeremy

7    Margolis and Rob Andalman on behalf of Amaro Goncalves, who is

8    present in court today standing before you.

9           THE COURT:  Welcome back.

10          MR. MARGOLIS:  Thank you, your Honor.

11          MS. PERKINS:  Good afternoon, your Honor.  Laura

12   Perkins on behalf of the United States.

13          THE COURT:  Ms. Perkins, would you enter an omnibus

14   appearance --

15          MS. PERKINS:  Yes --

16          THE COURT:  -- on behalf of the Government in all of

17   these cases, please.

18          MS. PERKINS:  Yes, your Honor.  Your Honor --

19          THE COURT:  You and Mr. Solomon.

20          MS. PERKINS:  Correct, your Honor.  Thank you.

21          THE COURT:  That will save a little time.

22          COURTROOM DEPUTY:  Calling criminal case 09-336, United

23   States of America versus Jeana Mushriqui and John Mushriqui.

24          Would counsel please come forward and identify

25   yourself.

1          MR. LEEPER:  Good afternoon, your Honor.  Charles

2    Leeper, L-E-E-P-E-R, for Jeana Mushriqui.  That's my client on

3    the far right over there.  And my partner, Barry Gross, is also

4    here today.

5          THE COURT:  Thank you.

6          MR. KRAKOFF:  Good afternoon, your Honor.  David

7    Krakoff for John Mushriqui.  He is standing to my right over

8    there.  And my partner, James Parkinson, is with me as well.

9          THE COURT:  Welcome back.

10         COURTROOM DEPUTY:  Criminal case 09-337, United States

11   of America versus David Painter and Lee M. Wares.

12         Would counsel come forward and identify yourself.

13         MR. ZEIDENBERG:  Good afternoon, your Honor.  Peter

14   Zeidenberg for Mr. Painter.

15         MR. ONORATO:  Good afternoon, your Honor.  Danny

16   Onorato and David Schertler on behalf of Mr. Wares who is

17   present in the courtroom.

18         THE COURT:  Welcome back.

19         COURTROOM DEPUTY:  Criminal case 09-338, United States

20   of America versus Pankesh Patel.

21         Counsel, please come forward.

22         MR. BRUCE:  Good afternoon, Your Honor.  Eric Bruce on

23   behalf of Mr. Patel, who is present at the rear of the

24   courtroom.

25         THE COURT:  Welcome back.

1          MR. BRUCE:  Thank you.

2          COURTROOM DEPUTY:  Criminal case 09-339, United States

3    of America versus Offer Paz.

4          Would counsel come forward and identify yourself.

5          MR. WEINGARTEN:  Reid Weingarten and Brian Heberlig,

6    your Honor, and, of course, Mr. Paz is here.

7          THE COURT:  Yes.  Welcome back.

8          COURTROOM DEPUTY:  Criminal case 09-340, United States

9    of America versus Michael Sacks and Israel Weisler.

10         Would counsel come forward and identify yourself for

11   the record.

12         MR. WISENBERG:  Good afternoon, your Honor.  Solomon

13   Wisenberg for Mr. Sacks, and Michael Patrick as well who your

14   Honor just admitted pro hac vice today.  And Mr. Sacks is in the

15   courtroom.

16         THE COURT:  Welcome back.

17         MS. PRAGER:  Good afternoon, your Honor.  Lisa Prager

18   on behalf of Mr. Weisler who is sitting over -- standing behind

19   my left shoulder.

20         THE COURT:  Welcome back.

21         MS. PRAGER:  Thank you, your Honor.

22         COURTROOM DEPUTY:  Criminal case 09-341, United States

23   of America versus John Benson Wier, III.

24         Counsel please come forward and identify yourself.

25         MR. COHEN:  Good afternoon, your Honor.  Barry Cohen on

1    behalf of John Wier.  Mr. Wier is standing up facing your Honor.

2              THE COURT:  Welcome back.

3              MR. COHEN:  Thank you, your Honor.

4              COURTROOM DEPUTY:  Criminal case 09-342, United States

5    of America versus Haim Geri.

6              Counsel, please come forward and identify yourself for

7    the record.

8              MR. BRUCE:  Good afternoon, again, your Honor.  Eric

9    Bruce on behalf of Mr. Geri who is standing at the rear of the

10   courtroom.

11             THE COURT:  Welcome back.

12             COURTROOM DEPUTY:  Criminal case 09-343, United States

13   of America versus Yochannan Cohen.

14             Would counsel please come forward and identify

15   yourself.

16             MR. DALE:  Good afternoon, your Honor.  Allen Dale on

17   behalf of Mrs. Cohen, who is present.

18             THE COURT:  Welcome back.

19             COURTROOM DEPUTY:  Criminal case 09-344, United States

20   of America versus Saul Mishkin.

21             Would counsel come forward and identify yourself.

22             MS. HORSTMAN:  Good afternoon, your Honor.  Brittney

23   Horstman on behalf Mr. Mishkin who is present in court standing

24   behind me.

25             THE COURT:  Welcome back.

1        COURTROOM DEPUTY:  Criminal case 09-345, United States

2   of America versus R. Patrick Caldwell and Stephen Giordanella.

3        Would counsel come forward and identify yourself.

4        MR. DUBELIER:  Good afternoon, your Honor.  Eric

5   Dubelier on behalf of Mr. Caldwell.  Mr. Caldwell is present in

6   court.

7        THE COURT:  Welcome back.

8        MR. CALLI:  Good afternoon, your Honor.  Paul Calli

9   who, along with my partner Steve Bronis who will be sworn into

10  the District bar on March 1st -- we are here on behalf of Steve

11  Giordanella who is present and standing before the Court.

12        THE COURT:  Welcome back.

13        MR. CALLI:  Thank you, sir.

14        COURTROOM DEPUTY:  Criminal case 09-346, United States

15  of America versus Andrew Bigelow.

16        Would counsel please come forward and identify

17  yourself.

18        MR. JACOBS:  Good afternoon, your Honor.  Lawrence

19  Jacobs on behalf Andrew Bigelow.  And Connie Mederos-Jacobs.

20        THE COURT:  Welcome back, everyone.

21        COURTROOM DEPUTY:  Criminal case 09-347, United States

22  of America versus Helmie Ashiblie.

23        Would counsel please come forward and identify

24  yourself.

25        MR. GOROKHOV:  Good afternoon, your Honor.  Eugene

1    Gorokhov on behalf of Mr. Ashiblie who is standing at the back

2    of the courtroom.

3              THE COURT:  Welcome back.

4              COURTROOM DEPUTY:  Criminal case 09-348, United States

5    of America versus Daniel Alvirez and Lee Allen Tolleson.

6              Would counsel come forward and identify yourself.

7              MR. VOLKOV:  Good afternoon, your Honor.  Mike Volkov

8    for Mr. Alvirez, who is standing to my left in the rear.

9              THE COURT:  Very good.  Welcome back.

10             MR. PASSANISE:  Good afternoon, your Honor.  Joe

11   Passanise representing Mr. Tolleson, who's on my right in the

12   back.  Thank you.

13             THE COURT:  Welcome back.

14             COURTROOM DEPUTY:  Criminal case 09-349, United States

15   of America versus John Godsey and Mark Morales.

16             Would counsel please come forward and identify

17   yourself.

18             MR. MADIGAN:  Good afternoon, your Honor.  Michael

19   Madigan together with Bree Murphy on behalf of Mr. Godsey who is

20   present in the courtroom standing back there, your Honor.

21             THE COURT:  Welcome back, Mr. Madigan.

22             MR. MADIGAN:  Thank you, your Honor.

23             MR. McCOOL:  Good afternoon, your Honor.  Steven McCool

24   on behalf of Mark Morales who is present in the courtroom to my

25   left.

1          THE COURT:  Welcome back, Mr. McCool.

2          MR. McCOOL:  Thank you.

3          COURTROOM DEPUTY:  And criminal case 09-350, United

4     States of America versus Jonathan Spiller.

5          Would counsel please come forward and identify

6     yourself.

7          MR. WAINSTEIN:  Good afternoon, your Honor.  Ken

8     Wainstein on behalf of Jonathan Spiller who is standing to my

9     right.

10          THE COURT:  Welcome back, Mr. Wainstein.

11          MR. WAINSTEIN:  Thank you.

12          THE COURT:  Well, I don't know how many more times we

13     will be able to get this room, so we might as well make the most

14     of it today.  We are here, first and foremost, to get an update

15     from the Government on the discovery production to date and

16     where it stands, where it's going, what the time table is,

17     realistically, for getting each counsel and each Defendant the

18     discovery that's necessary and appropriate so that they can

19     start assessing the case and what Motions, if any, they need to

20     file.

21          At the last hearing, of course, you all are aware that

22     the Government indicated to the Court that it's reserving its

23     right to reformulate the indictment along the lines of one

24     conspiracy, almost an omnibus -- I am not quoting them, but this

25     was the essence of the idea -- have an omnibus conspiracy.  And

1    we will wait and see.  As Mr. Krakoff likes to say, we are

2    learning as we go along.  Well, everyone is learning here, the

3    Court included, so we are going to learn.

4         But in the meantime, the government did represent that

5    once the discovery was provided to counsel and they had a chance

6    to review it, they would have a much clearer sense of the

7    Government's case as to each individual Defendant and then how

8    it may all interrelate for the purposes of any reformulation of

9    the indictment itself.

10        So why don't I start off asking the Government to give

11   an update in that regard, and any other issues the Government

12   believes is appropriately to be discussed at this point.  And

13   then we will go back through the list and give each counsel an

14   opportunity -- I don't expect that you are in a position today,

15   any of you, especially with an intervening snowstorm that set

16   all the records, I guess, in the history of Washington -- so I

17   don't expect that you have had the opportunity even to

18   completely digest all that you have already received.  But

19   having said that, you may have had some initial opportunity to

20   review what's been provided, and you may have some issues or

21   some observations that you want to put on the record at this

22   early point in the process.

23        So let's start with the Government, and we will see how

24   it proceeds.

25        MS. PERKINS:  Thank you, your Honor.  Unfortunately,

1    given the snowstorm, we are not quite as far along in the

2    discovery process as we had hoped to be when this hearing was

3    set.  But even though we were closed for the majority of time in

4    between the two conferences, we have been able to distribute to

5    most of defense counsel the hard drive that we had discussed at

6    the last status conference.

7         The hard drive contains all of the recorded calls, all

8    of the calls that have been recorded in connection with the

9    undercover investigation.  That was given to each defense

10   counsel that gave us a hard drive.  I believe there's six

11   Defendants who have not yet sent a hard drive to the FBI, but

12   other than those six, we have either sent them out already or

13   will be sending them today --

14         THE COURT:  Okay.

15         MS. PERKINS:  -- those hard drives.

16         THE COURT:  Let me just -- just for clarification

17   purposes, the calls you are referring to that were recorded, on

18   a Defendant-by-Defendant basis, are those the calls that that

19   Defendant was involved in or all the Defendants were involved

20   in?

21         MS. PERKINS:  We have given each Defendant the calls

22   that any Defendant, any charged conspirator was involved in.

23   And we have organized it in a way that enables them to easily

24   figure out which calls their client was on.

25         THE COURT:  Okay.

1        MS. PERKINS:  So on the hard drive it's organized --

2   there are separate files, and the files are named by charged

3   co-conspirator.  And in that file -- in each file contains all

4   of the calls that that Defendant either participated in or was

5   mentioned in.

6        So even if the Defendant was not a participant to the

7   call, we have put it in that folder for ease of review for

8   defense counsel.

9        THE COURT:  All right.

10       MS. PERKINS:  So that we have -- we have gotten out

11  most of those hard drives.  Additionally, we distributed today

12  for the most part -- well, I say "for the most part" because

13  some, I think, went out maybe yesterday, but everyone now either

14  got today or will be getting via FedEx today a production of one

15  CD that contains hard copy documents that are e-mails and

16  invoices, also the memorandum memorializing their client's

17  post-arrest interview.  So that has gone out to defense counsel

18  as well.

19       We also have given defense counsel 16 CDs that contain

20  all of the audio from all of the recorded meetings that are

21  discussed in the indictments, all of the indictments, your

22  Honor.

23       So for each Defendant we have given the recorded

24  meetings for every charged conspirator.  And by doing that, we

25  do identify which individuals we believe are conspirators just

1      by nature of providing the meetings with those individuals.

2             THE COURT:  Now, this is not to be distinguished from

3      videotape, is it?  Or are there any videotapes?

4             MS. PERKINS:  There are videotapes, your Honor.  Those

5      we are working with a vendor to figure out how to get copies

6      made of.  But with the defense counsel that we have spoken to,

7      we have let them know that those videos, if they choose to

8      review the videos, the videos are all available for their review

9      at the FBI in Manassas starting immediately.  We just have not

10     been able to get the vendor to copy those material yet.  But we

11     will get those copied, your Honor.

12            THE COURT:  Would you have a -- kind of an estimated

13     timetable to do that?  Would, say, two weeks, three weeks be

14     realistic?

15            MS. PERKINS:  Your Honor, in addition to the video for

16     the meetings discussed in the indictment, we also have all of

17     the meetings that were recorded during the undercover operation.

18     Just to give you an idea, your Honor, it's 231 recordings which

19     contains -- each one of those recordings may contain several

20     different meetings.  In total, it's 805 hours of video

21     recordings for the meetings, as well as audio recordings for

22     those meetings, so it's a significant undertaking to get those

23     copied.  So I don't -- two to three weeks, I don't believe, is a

24     realistic estimate.

25            We have submitted the materials to a vendor to have

1    them take a look at it, see how long it will take them.  The way

2    the files currently are, they use FBI software that will need to

3    be removed, and they will need to be converted into WAV files to

4    enable us to burn them to CDs and send them to defense counsel.

5    That's all going to take a little while.  But we've started that

6    process.  We have sent the materials to a vendor to get a bid

7    and an estimate, a timing estimate.  We just haven't heard back

8    yet, your Honor.

9         At this point those are the categories of discovery

10   that we have sent out.  As I've mentioned, we do have video

11   recordings for both the meetings that are discussed in the

12   indictment as well as other meetings that occurred during the

13   course of the undercover operation that we are working on, but

14   defense counsel can go review that at the FBI.

15        THE COURT:  How would the -- as you know, hopefully,

16   from experience, oftentimes voice recordings are of, let's just

17   say, inconsistent quality.  Not having listened to any of these,

18   I have no idea what we are dealing with here.  And oftentimes

19   transcripts are essential in order to help basically follow

20   what's on these recordings.

21        What's your sense of the quality of the audio

22   recordings, A?  And, B, are you planning on, in some instances

23   or in all instances or in no instances, coming up with

24   transcriptions of what's being said on these audio recordings?

25        MS. PERKINS:  Your Honor, my understanding of the audio

1    recordings is that, for the most part, they are very good.

2    There were -- it depended on the particular meeting, but there

3    may have been several different microphones in place at the

4    meeting, and we have endeavored to get defense counsel the best

5    recording out of the group.

6          That being said, we are working on transcripts.  We

7    don't have them finalized.  Like I said, it's a significant

8    amount of time.  But we are working on that and when that is

9    completed, we can make those available as well, your Honor.

10          THE COURT:  All right.  Very good.

11          MS. PERKINS:  In addition to the video, there is also

12   audio recordings from those meetings as well that we will make

13   available and hopefully copy, through the vendor process that I

14   mentioned.

15          There are e-mails -- although we did produce e-mails as

16   part of this production that I discussed, there are other e-mail

17   communications that the Defendants may have had with undercover

18   agents and/or the individual described as individual 1 in the

19   indictment.  We are working on gathering those.  We are working

20   with Yahoo! and Google to get those e-mails in a full set so

21   that we can produce those to defense counsel.

22          The Yahoo! process is moving along a lot faster, so we

23   will hopefully be able to get those to defense counsel I believe

24   within the next few weeks.  And then Google we are still working

25   on, your Honor.

1          The other category of documents will be source

2     documents, documents related to the individual described as

3     individual 1 in the indictment.  Those are not yet prepared for

4     production.  We need to review those.  We need to process them

5     for production, and we are working on that.  We are trying to

6     get those reviewed as quickly as possible, but it's difficult

7     for me to give a reasonable estimate at this point.  Hopefully

8     within -- it's hard to say, your Honor.  It's a significant

9     amount of materials to review.  And that's the -- those are the

10    categories of discovery that we will have for defense counsel.

11         A significant amount of the discovery, your Honor, has

12    been produced as of today with the calls, which is 5,287 calls,

13    were produced on the hard drive.  Recordings of the meetings,

14    the audio recordings of the meetings, is for, you know, every

15    meeting that was discussed in the indictment.  So that's a

16    significant volume of discovery that we have produced.

17         THE COURT:  What would your estimate be as to when you

18    think you might be complete?  A month?  Two months?

19         MS. PERKINS:  Given the vendor issues, your Honor, I

20    don't know that a month is -- I don't believe a month would be

21    realistic, just to get that in process and copying.  I believe

22    it's -- I think it was somewhere in the range of 200-and-some

23    CDs that will need to even just be sent there and then processed

24    and handled that way.  So to make 22 copies of anything alone

25    takes a significant amount of time.

1          I would say -- I don't think -- we can do this, and we

2     intend to do this, on a rolling basis, your Honor, but I would

3     hope that we could have the bulk of things to defense counsel

4     within the next -- we will endeavor for the next eight weeks,

5     but I don't know how realistic that is, like I said, with the

6     vendor issues.

7          THE COURT:  Are you planning on filing a Motion to have

8     this case exempted from the Speedy Trial Act because of its

9     complexity?

10          MS. PERKINS:  Your Honor, we were waiting to hear what

11     defense counsel thought of their review of the discovery.  The

12     allegations in the indictments themselves are not that

13     complicated, but the volume of discovery here is significant, so

14     that that is a consideration.  We have not yet decided.

15          THE COURT:  Yes, but eight weeks from now, the Speedy

16     Trial Act could have -- so, I mean, you have got to move.  If

17     you want this time excluded, I have no reason to believe these

18     defense counsel are going to exclude the next eight weeks.  Or

19     maybe I will be surprised in a minute.

20          So if you are going to want to qualify, you are going

21     to have to file a Motion and they are going to have an

22     opportunity to oppose it, and obviously they may or may not

23     choose to oppose it.  They may want the time themselves,

24     frankly, to carefully analyze and review all that's being

25     produced.

1          It sounds to me like a significant amount of

2     information, especially if the Government is, as it has

3     indicated, thinking about reformulating the indictment to make

4     some kind of an omnibus conspiracy allegation against all these

5     Defendants.

6          Now, how that would be formulated, how it would be

7     tried, those are bigger questions than we have to resolve in the

8     next eight weeks, but certainly the Speedy Trial Act is ticking.

9     It's ticking right now.  And unless there is some accord reached

10    between the Government counsel and all the defense counsel that

11    this case should qualify for that exemption, which the Court

12    could obviously consider, then we have to litigate it, and we've

13    got to get going.

14          MS. PERKINS:  Your Honor, I understand that, and my

15    estimate on the timing was getting defense counsel copies of the

16    discovery.  Like I mentioned, the discovery -- the videos, the

17    audio -- those are all ready for immediate review at the FBI.

18    So the defense, if they choose to pursue Speedy Trial and the

19    Government doesn't choose to file something along those lines,

20    your Honor, the discovery can be made available to the defense

21    counsel.  I apologize if I was unclear.  I just meant -- my

22    timing estimates was on getting copies of the discovery to

23    defense counsel.

24          So I believe that we could -- I mean, we can tomorrow

25    make all of the video and audio recordings available to them at

1        the FBI.  It's just a matter of copies to them, your Honor.

2             THE COURT:  But obviously they can't all go to the FBI

3        simultaneously and review it.  I mean, we have got here a

4        ceremonial courtroom full of lawyers.  And I don't know what the

5        FBI's facilities look like, but based on my recollection of

6        years ago as a defense counsel, it's not going to accommodate

7        all these lawyers simultaneously to review these things.  It's

8        just not going to happen.

9             So from a realistic practical point of view, the

10       Government needs to be -- as well as the defense counsel --

11       thinking about the practical, logistical questions here so that

12       the Defendants have a meaningful opportunity, and their counsel,

13       to review what's been produced, analyze it, figure out what

14       their exposure is in terms of the case as currently

15       formulated -- and it may be reformulated -- and then assess

16       where they are going, at least from each Defendant's point of

17       view, where they see this going.

18            Now, based on what you have been alluding to,

19       5,000-plus calls, 231 recorded video encounters totaling

20       805 hours, it's starting to sound like it's moving towards that

21       zone of so complex that the Speedy Trial clock should be not

22       applicable.

23            So -- I am not telling you what to do.  I am telling

24       you to think about it, though, because the next one of these

25       get-togethers we have I will need to either have a Motion filed

1        or -- I will need an answer.

2                MS. PERKINS:  Okay, your Honor.

3                THE COURT:  Very good.

4                MS. PERKINS:  Thank you.

5                THE COURT:  You are welcome.

6                Mr. Margolis and -- let's see.  The first team, the

7        first group of defense counsel.

8                MR. MARGOLIS:  Thank you, your Honor.

9                THE COURT:  Are you getting some of this stuff?

10               MR. MARGOLIS:  We did.  We have it here, your Honor.

11       We received it from Laura when we came to Court this afternoon.

12       It appears to be as she described it.

13               There are two letters of transmittal with the

14       materials.  The letter of transmittal with the -- I think it's

15       21 or so CDs says that the Government will work with us to

16       secure a reasonable continuing production, reasonable in terms

17       of time.  The transmittal letter with respect to the 30-gig hard

18       drive, which we provided and was returned today, says we will

19       receive more information shortly.

20               I will tell you, for Mr. Andalman and my perspective on

21       behalf of Amaro, from what we see in the indictment, the case is

22       a relatively straightforward, not complicated, not complex case.

23       There obviously is a mass of information that has been presented

24       to us today, and presumably we will get more.  And presumably,

25       if we choose to, we will have the opportunity to listen to

1    805 hours of what I think may be extraneous video and audio.  I

2    am not sure what the relevance to our allegations are of these

3    5200-plus telephone conversations, but we will figure that out.

4    But, to us, this seems like a pretty straightforward case, and

5    we are prepared to start digging through the discovery as soon

6    as I can have Rob show me how to plug this in and start

7    reviewing.

8           THE COURT:  Do you have any sense, at this early point,

9    as to how this case may appear with regard to your client as it

10   relates to all the others not mentioned in the indictment

11   against him?

12          MR. MARGOLIS:  Not yet, your Honor, because we have yet

13   to see any of this material.  And I don't believe the 302s for

14   other Defendants in all these other cases are in these

15   materials, and I am not sure, you know, if and when those will

16   be produced as well.  Obviously we are very, very eager to

17   receive the information about individual 1.  That is of great

18   interest to us.

19          But, again, the allegations, even the conspiracy

20   allegation against Amaro, is fairly straightforward.  It's a

21   handful of meetings and phone calls, a lot of documents around

22   it.  And we will wade through it.  But we don't see this as a

23   complicated case, your Honor.

24          THE COURT:  So you think if I set another one of these

25   get-togethers in a few weeks, you would be in a position by then

1   to give me a little firmer response on the issue of --

2           MR. MARGOLIS:  Certainly.

3           MR. ANDALMAN:  Your Honor, I did talk briefly with

4   Ms. Perkins after our arraignment a couple of weeks ago, and I

5   asked whether the Government would be in a position to direct us

6   to points in the discovery that were relevant to their one

7   conspiracy theory -- and I think I am getting this right.  She

8   said it wasn't so much that there was going to be -- there

9   aren't conversations between our client and the other

10  Defendants, and there may not even be conversations in which he

11  is discussed in conversations with others.  There might be, but

12  there may well not be -- she wasn't sure.  She said really their

13  theory is that they were all part of one transaction -- they

14  knew that their transaction was part of a group of transactions

15  and, therefore, that was the basis of the conspiracy theory.

16          We are a little bit skeptical of that, but we haven't

17  looked at this yet.  But if that's their theory, then I think

18  that much of the hundreds of hours of video and thousands of

19  hours of audio is pretty much extraneous because that issue

20  we'll resolve as a legal matter, and then what we are left with

21  is, you know, two or three meetings and a couple of phone calls

22  and a couple-day trial.

23          THE COURT:  Well, I would assume you would believe that

24  it would be difficult for you to formulate what Motions you need

25  to file until you have a clearer sense of --

1          MR. ANDALMAN:  We've got to look at it.

2          THE COURT:  -- whether or not the indictment is going

3    to be reformulated.

4          MR. ANDALMAN:  We haven't gotten any sense from them

5    that they are going to reformulate it.

6          MR. MARGOLIS:  Maybe I misunderstood.  I thought I had

7    the sense last night, when I talked to Laura, that that was not

8    forthcoming, but I am not sure.

9          THE COURT:  Well, they are going to have to fish or cut

10   bait on that issue in the pretty near future.

11         MR. MARGOLIS:  We would like that.

12         THE COURT:  All right.

13         MR. MARGOLIS:  Thank you so much, your Honor.

14   Appreciate your time.

15         THE COURT:  All right.  Mr. Leeper and Krakoff I think

16   are next.

17         MR. LEEPER:  Your Honor, I find myself in the

18   unenviable position of having right off the bat to disagree with

19   my distinguished defense counsel colleague.  The notion that we

20   would be able to know anything about the direction of this case

21   within a few weeks strikes me as quite unrealistic.

22         I don't doubt Government counsel's representation that

23   a significant quantity of documentation has been produced as of

24   today.  We just received the first portion of discovery

25   yesterday, the audio calls that she described.

1          THE COURT:  Yes.

2          MR. LEEPER:  In addition to the hundreds and hundreds

3   of additional hours of recordings that counsel, who is going to

4   effectively represent their client, would have to listen to, we

5   have, for example, literally hundreds of e-mails and voice mails

6   sent by the Government informant, Richard Bistrong, to our

7   clients as he pursued them over a course of many months.

8          It is troubling to hear that the Government may not

9   even have those e-mails.  They are obtaining them from Google

10  and Yahoo!?  What does that mean?  Mr. Bistrong was sending

11  these e-mails out over an account over which the Government

12  wasn't exercising any control?  When will we get those e-mails?

13  I guess it depends on how busy they are out in Mountain View

14  where Google is located.

15         I didn't hear anything from Government counsel about

16  all of the documents that they seized from my client's office.

17  They executed a search warrant in Upper Darby, Pennsylvania.

18  They took everything.  Every scrap of paper.  They examined the

19  computers.  They have since imaged their laptops.  I have not

20  heard any predictions about when we might be receiving those

21  materials.  Needless to say, we are entitled to those materials

22  under Rule 16.

23         And then we have the background of Mr. Bistrong.  As I

24  understand it, he has been working for the Government out there

25  trolling for potential Defendants for a couple of years now.  We

1    need all of the material on the background of Mr. Bistrong.  We

2    need all of the material that shows all of his wrongdoing, which

3    apparently was quite extensive, which led him to make this

4    bargain with the Government.  We need all the materials relating

5    to the management of Mr. Bistrong.  Was he on his own sending

6    e-mails without any supervision from the Government?  Or was he

7    strictly controlled?

8           So, frankly, your Honor, I think that -- I think it was

9    the Court that mentioned eight weeks -- strikes me as far more

10   realistic a time period by which we can expect to have some of

11   this material than the few weeks mentioned by my colleague.

12          And, your Honor, I am going to have a housekeeping

13   matter that Pretrial Services asked that I raise with the Court

14   regarding the conditions of release for my client.  I expect you

15   would like me to take that up at the end?

16          THE COURT:  Yes, that makes sense.

17          MR. LEEPER:  Okay.

18          THE COURT:  We will leave those kind of issues to the

19   end to the extent they exist.

20          Mr. Krakoff.

21          MR. KRAKOFF:  Good afternoon again, your Honor.  I am

22   in the same position as Mr. Leeper.  The discovery that's in

23   front of us is extensive.  It's quite substantial.  We have got

24   hundreds of hours of videotapes.  I did my little math on my pad

25   here.  805 hours of video comes out to I think something like --

1    I am not very good at math, your Honor, but something like

2    33 days, 24 hours a day.

3         What I didn't hear was anything about what -- some of

4    the most critical evidence in this case, and that is 404(b).  I

5    heard nothing about Brady.  I heard nothing about Giglio.  This

6    is an entrapment case.  That's what it is.  And we need to know

7    everything there is about Mr. Bistrong.  We heard from the

8    Government -- and we had a session with Mr. Walther -- and we

9    heard that he had been -- Mr. Bistrong had been working for the

10   Government for two-and-a-half years -- and I underscore for the

11   Government, because that's what this is all about.  Our clients

12   were pursued.  What -- the little that we have been able to see

13   so far is absolutely indicative of that call after call after

14   call, e-mail after e-mail.  So the management of Mr. Bistrong is

15   critical to this case.

16        We have submitted a discovery letter.  Undoubtedly we

17   will hear from the Government in due course.  A lot of this

18   stuff is not controversial, but I suspect that we will have

19   resistance to what we need to know about Mr. Bistrong and what

20   we need to know about the FBI agents who managed Mr. Bistrong.

21   How did this man come to their attention?  How was he managed?

22   What kind of deals did he make day after day after day?

23        So those some of the things that we haven't seen that

24   we need to see, and it's going to take a substantial amount of

25   time to get that material, to go through it.  So we are -- I

1    think, your Honor, eight weeks is -- we are a long way off.

2             THE COURT:  Do you have a sense of whether or not you

3    would be likely to support a request for an exemption to the

4    Speedy Trial Act because of complexity?

5             MR. KRAKOFF:  Your Honor, I would have to see their

6    Motion, of course, and I hesitate to --

7             THE COURT:  I don't want to put you on the spot.  I am

8    just wondering if you've even had a chance to really analyze it

9    at all or think about it much.

10            MR. KRAKOFF:  What I do know, your Honor, is that we

11   are committed to giving the best defense that we can to our

12   clients, needless to say, as everyone in this courtroom.  And

13   whatever time that it requires to do so, that's what we are

14   going to apply to this.  So -- and I recognize I am kind of

15   hedging, but that is something that clearly is a factor under

16   3161(h)(8) -- or (7), excuse me.  And we will respond, of

17   course, in due course.

18            We have not had any clarification on this Rule 13 issue

19   that the Court -- that was raised by the Government in the last

20   hearing and this consolidation issue.  And I have to say, your

21   Honor, that we are still -- it's still, frankly, a novel concept

22   to me.  It's still -- I am -- we are still learning about this

23   because we haven't had any clarification.  There remains

24   ambiguity on this critical issue.  And that gets to how long

25   it's going to take to do discovery and to get prepared.

1          But I'd note that our clients stand apart.  They are

2     different.  And we were already told they are not on tapes with

3     other Defendants.  We were already told that.

4          So while Rule 13 does permit consolidation if it would

5     have been permitted previously, we can see, at least at this

6     point, our clients stand far apart and there could be no --

7     assuming the Government seeks to go in that direction, we will

8     deal with it if we ever have to see it, but certainly at this

9     point, your Honor, we are still learning, still ambiguous, and

10    our clients are clearly different.

11          THE COURT:  Thank you, Mr. Krakoff.

12          Mr. Zeidenberg and Mr. Onorato are next.

13          MR. ZEIDENBERG:  Good afternoon, your Honor.

14          THE COURT:  Mr. Zeidenberg.

15          MR. ZEIDENBERG:  Your Honor, we -- you know, as you

16    know, we just met our clients in person today, and we have

17    gotten discovery yesterday and we are going to start to go

18    through it.  I have been apprised about what happened at the

19    initial appearance a couple of weeks ago with the other

20    Defendants, and the Government's suggestion that the indictment

21    that has been presently drafted may not be -- really illustrate

22    what may happen at a trial, if one should come to pass.

23          And that's difficult -- presents a lot of difficulties

24    for us in reviewing the evidence because, as described by the

25    Government, it covers this huge number of calls, this huge

1    number of videos.  You know, I don't anticipate listening to

2    5,287 calls and, if I can avoid it, 805 hours of recordings.  I

3    want to focus on the things that involve my client and his

4    co-conspirators.

5          Now we're told all of them are co-conspirators.  Well,

6    you know, maybe under some concept, but from a practical

7    standpoint what we care about is the ones that are going to be

8    affecting him if he goes to trial.

9          So what we really would like is some guidance and some

10   instruction from the Government as to what their theory is as to

11   notice so we can understand how to dig into this pile.

12   Obviously, we will be looking at all the tapes of our own

13   client, but to try and decide what other tapes, what other

14   recordings we need to be looking at, it depends on their -- you

15   know, what bucket they are going to put them in, if they are

16   going to put them in one.  And I think that would also inform

17   our decision about whether or not this, in our view, is a

18   complex case because I think from the perspective of Mr. Painter

19   and Mr. Wares' counsel, if it's just Mr. Wares and Mr. Painter,

20   it's not a complex case.  If it turns out there's a half a dozen

21   more Defendants thrown in with them, then it may well, in fact,

22   be, and we are going to have to dig into all those other

23   matters.

24         So I don't think we can -- personally I can't give the

25   Court an indication of whether or not we agree or not with that

1    assessment.

2            THE COURT:  Okay.  Thank you, sir.

3            MR. SCHERTLER:  Your Honor, good afternoon.  David

4    Schertler and Mr. Onorato on behalf of Lee Wares.  I would

5    concur with Mr. Leeper and Mr. Krakoff said, especially with

6    respect to Richard Bistrong.  We think that's critical evidence,

7    and we think that the defense needs to have that sooner as

8    opposed to later.  I was a little dismayed that we didn't hear

9    about that evidence when the Government talked about the

10   discovery they are providing.

11           Our clients are also in -- not unique to all the

12   Defendants in this situation, but our clients are not American

13   citizens and not American residents.  And we are gracious that

14   we were able to resolve the bond issues with the Government, but

15   at the same time, these men are now expected to stay here in the

16   United States away from their families for extended period of

17   time.

18           Mr. Wares just arrived here yesterday.  We have not

19   been able to spend a lot of time with him, and we are not in a

20   position to waive the Speedy Trial.  But, frankly, I agree with

21   Mr. Zeidenberg that if this is just Mr. Wares and Mr. Painter,

22   it's not a complex case.  I think my client, while we may change

23   depending on discussions with the Government -- but my client is

24   anxious to resolve this matter.

25           And I think that -- you know, one of the things that

1    surprises me a little bit is that a lot of discovery that the

2    Government is talking about now taking six to eight weeks to

3    provide could have easily been prepared long before the

4    indictment, and should have been prepared before the indictment,

5    and they should have been prepared to hand that over to the

6    defense when we came here for arraignment.

7            I think the only thing that may take a little bit of

8    time is, as Mr. Leeper talked about the search warrants that

9    were executed contemporaneously with the arrest -- it may take

10   some time get that together.  But everything else should have

11   been prepared and should have provided.  I don't think that's

12   sufficient reason for the Government to come in and claim that

13   this is a complex case and doesn't -- and should be exempted

14   from the Speedy Trial requirements.

15           THE COURT:  Thank you, sir.

16           Mr. Bruce.

17           MR. BRUCE:  Good afternoon again, your Honor.  I will

18   just sort of try and be brief, echoing most of what my

19   colleagues have said.  I think we all have a very substantial

20   amount of work in front of us to the point where eight weeks

21   might even be optimistic to get all these materials from the

22   Government and intelligently go through them so that defense

23   counsel can take positions on issues like this global conspiracy

24   theory and also Speedy Trial Act issues.

25           I think we are all -- all of the defense counsel --

1    feeling a little bit left in the dark in trying to take

2    positions here when we don't know, is this one big complicated

3    case or are these smaller 16 individual cases?

4           THE COURT:  Well, in your case, there is an added

5    complexity, and that is the potential conflict of interest

6    depending upon the Government's theory of the relationship

7    between your client -- your two clients, I should say.

8           MR. BRUCE:  That's correct, your Honor.  And I have

9    done everything I feel like I can do on my own in speaking with

10   my individual clients to address that.  I am very comfortable

11   that if it's even a potential conflict of interest, it's so

12   remote that it would be easily waiveable.

13          I would like to continue to talk to the Government

14   about their position on that.  And certainly, if it were

15   necessary, if the Government thought it were necessary, or the

16   Court thought it were necessary, we would be prepared to come in

17   and speak to your Honor about that, have any kind of evidentiary

18   hearing that was necessary to waive that and make sure that that

19   waiver was knowing and intelligent.

20          Lastly, I would also add, your Honor, just in terms of

21   timing, I do think the issue of the search materials is going to

22   be a very complicated one.  Based on my experience, that's a

23   very time-consuming task to take all of these search materials

24   from 14, 15, 16 different search locations and copy them,

25   distribute them, get the hard drives out to defense counsel.

1          And that evidence may well bear on some of these issues

2     as well, whether it's one big conspiracy or smaller

3     conspiracies, and whether any complicated case exception would

4     apply on the Speedy Trial rules.

5          THE COURT:  Very good.

6          MR. BRUCE:  Thank you.

7          THE COURT:  Thank you Mr. Bruce.

8          Mr. Weingarten.

9          MR. WEINGARTEN:  Your Honor, we, of course, have taken

10    a position on whether or not we believe there is one conspiracy

11    or distinct criminal cases in our reply brief.  We have

12    expressed extreme skepticism that the Government will ever be

13    able to show the necessary rim to this alleged hub-and-spoke

14    conspiracy, but we think this is resolvable -- and I am sure the

15    Court is going to do this -- give them a deadline; give them a

16    time when they will announce whether or not they are going to

17    supersede, and it all goes from there.

18          On the Speedy Trial issue, of course, if our client

19    continues to be detained, we will aggressively seek the

20    speediest of speedy trials.

21          THE COURT:  Thank you, Mr. Weingarten.

22          Mr. Dubelier and Mr. Calli.

23          MR. CALLI:  Paul Calli on behalf of Steve Giordanella.

24    I agree with the last comments that sort of the answers to these

25    questions are driven by what indictment and what conspiracy

1    theory in which codefendants were proceeding to trial on.  So we

2    will continue to plow through 70 or 80 calls that may relate to

3    us with an eye toward trying to -- to determine what basis will

4    come forward.

5         But the need to review 800 hours of movies at the FBI,

6    if the indictment is going to remain as constituted, I don't

7    know the wisdom to that.  So we are anxious to hear what case

8    we're --

9         THE COURT:  Well, at 40 hours a week, that's 20 weeks.

10   That's a lot of movies.

11        MR. CALLI:  More movies than I have watched, ever.

12        THE COURT:  Yes.

13        MR. DUBELIER:  Eric Dubelier behalf of Mr. Caldwell.

14   Thank you, your Honor.  Mr. Schertler just made a comment that

15   reminded me of something, for those of us I think who have

16   practiced as Assistant United States Attorneys in the

17   district -- I stood before this Court 20 years ago as a young

18   Assistant U.S. Attorney in front of former Chief Judge Robinson,

19   and I had indicted a complex case, and I asked him for a couple

20   of weeks to get the discovery ready, and he said, Mr. Dubelier,

21   you indicted the case; you better be ready for trial.  Turn the

22   discovery over.  I think that was a Friday.  And by Monday we

23   had turned the discovery over because I didn't have a choice.

24        And so I learned a lesson, as a young lawyer, that if

25   you're going to go ahead and pull the trigger and you are going

1    to indict the case, you better be ready to go to trial.

2          And I think what's going on here is -- and I will say,

3    and I do want to say this because I think it's important for the

4    Court to hear this -- I have communicated with the prosecutor by

5    e-mail.  She has been very cooperative with me.  She offered to

6    have a meeting.  We pushed really hard to get our discovery, and

7    we got it.  We actually picked up copies of the CDs this

8    morning, and so I have people looking at them now.  But from

9    what I have seen so far, I mean, I feel very, very strongly that

10   this is 16 small cases, and that if they are left as 16 small

11   cases, these are all two-day trials; the discovery is not

12   overwhelming; it won't take an enormous amount of time for us to

13   look at this stuff.

14         Because what happened is the Government took a deal,

15   through this informant, and offered the same deal to a bunch of

16   unrelated people.  And then they separately dealt with the

17   Government informant on that deal.  These companies and these

18   individuals have nothing to do with each other.  There is no

19   connection whatsoever to each other.  There is no crossover on

20   these tapes that I can see.

21         So this is a two-day case.  And, you know, my view --

22   and I feel very strongly on behalf of my client, your Honor --

23   my client had been out of Government service for less than two

24   months when this started.  He spent over 30 years in the United

25   States Secret Service.  He is an honored war veteran of the

1    Vietnam War.  He won the silver star.  He almost died in

2    Vietnam.  This has ruined his life, and I want to fix it for

3    him.  And so I want a trial.  I mean, we have no interest

4    whatsoever in taking a complex case designation, Speedy Trial

5    waivers or anything.  I want to come here.  I want to try the

6    case.

7             I will tell the Court also that, to the extent I have

8    looked at discovery, in our case, Mr. Bistrong signed a document

9    certifying that he wouldn't violate the Foreign Corrupt

10   Practices Act.  He also told my client on a telephone call the

11   Foreign Corrupt Practices Act doesn't apply to the fake

12   Government official that the Government proffered that was part

13   of this transaction.  He said that to my client on a telephone

14   call, and I listened to that tape this morning.

15            So I really am urging the Court in the instance of my

16   client -- I have no intention of looking at 500 hours of

17   videotapes and 800 telephone tapes or anything like that.  What

18   I am going to do is I am going to finish looking at the

19   discovery, as I told the prosecutor.  I will go talk to them and

20   make a presentation to them about my view of the case.  They can

21   either agree with me or they won't.  If they disagree, I am

22   going to go talk to their supervisors.  If they disagree, I

23   would like to have a trial.

24            On some of the more pedestrian matters, your Honor,

25   discovery in Manassas -- Manassas is not in the District of

1    Columbia.  All right.  So I would ask the Court to order the

2    prosecutors to make any discovery that they want to make

3    available that we can't have copies of now available here in the

4    District of Columbia where most of these lawyers are located.  I

5    don't think that's an unreasonable request, and I don't think we

6    should have to go personally or be sending lawyers who work for

7    us out to Manassas to listen to tapes.

8           Secondly, your Honor, this notion that, again -- and I

9    am echoing the comments made by my colleagues -- that they are

10   going to get discovery on all of this stuff in eight weeks, that

11   is absolute insanity.  And I know the Court was looking at

12   counsel when you posed the question to counsel about when is the

13   discovery going to be ready -- but counsel at the podium looked

14   at co-counsel at the table and he just shrugged "I don't know."

15   Because they don't know.

16          But I will tell you this.  Based on my experience, the

17   notion that they are going to have all this ready is eight

18   weeks, if they really decide this is going to be one big case

19   and they are going to bomb us with all this discovery, it will

20   be eight months before we get all the discovery that would be

21   required to try this case with 22 Defendants.

22          I would like to comment on one other point that the

23   prosecutor made, your Honor, and then I will --

24          THE COURT:  I will save your breath there.  There won't

25   be any trial of 22 Defendants.  That's not going to happen.  It

1    can't happen.  There is no jury in this country, or Judge for

2    that matter, that could sit through a trial and parse the

3    evidence for 22 Defendants.  It's not going to happen.

4         So if there's going to be trials -- excuse me.  If

5    there is going to be one omnibus conspiracy theory indictment,

6    superseding, for 22 Defendants, it's still going to have to be

7    broken up into pieces so that the trials can be digestible by 14

8    regular citizens of the District of Columbia.

9         So there just isn't going to be one big trial for 22

10   Defendants.  It's not possible.

11        MR. DUBELIER:  Your Honor, I not only fully agree with

12   you, but the notion that they would take 16 separate little

13   cases, stick them all together and then have to break them all

14   up to try them anyway -- and the only thing they've accomplished

15   by doing that is bombing us with 99 percent of the discovery we

16   get are going to be completely irrelevant to our individual

17   clients -- they're going to relate to all the other cases -- is

18   craziness, and they are never going to be able to do it.

19        What they are going to do -- ultimately do you know

20   what happen if they do that?  They're going to mess up any of

21   these 16 cases that they possibly have that they can get

22   convictions on -- they are going to mess them all up.  They have

23   to learn their own lessons.  We all had to do that in our own

24   practice, and we all had to learn our own lessons.

25        One other point, your Honor, just briefly.  The

1    prosecutor made a comment which is troubling to me.  She said

2    that on some of these recordings there was more than one

3    microphone present so there may have been more than one

4    recording, and they have endeavored to give us the clearest

5    recording that there was.  That doesn't work.

6          You know, it's clear from the rules -- Federal Rules of

7    discovery that if there are five recordings of a particular

8    meeting and some are of better quality than the others, we get

9    all five, because all of those contain statements of our

10   clients, and we determine whether or not there's any side

11   conversation that you can pick up one tape that you may not able

12   to pick up on another tape.

13         So I just wanted to call that to the Court's attention

14   because I heard the prosecutor say that, and if that's the case,

15   they have to rethink the discovery they have already given us

16   and get another round out in terms of the multiple copies of

17   these tapes that may exist.

18         Thank you for your patience, your Honor.

19         THE COURT:  All right.  Thank you.

20         I skipped a little out of order there by accident, so

21   let me go back to the order.  The next group is Ms. Prager and I

22   think Mr. Wisenberg -- it's not on this list here.

23         COURTROOM DEPUTY:  I am sorry.

24         MS. PRAGER:  Good afternoon, your Honor.

25         THE COURT:  Ms. Prager.

1          MS. PRAGER:  It's interesting listen to Mr. Dubelier

2     tell his war stories since I recall being an Assistant in his

3     section saying that I had indicted a case and it would take me

4     several months to get the discovery ready for trial, and he

5     said, not in this section.  You indicted the case, you better be

6     ready to go to trial.

7          So I think --

8          THE COURT:  Well, I will take judicial notice, this

9     isn't the rocket docket.

10          MS. PRAGER:  Right.  No, but it all goes along with how

11    that stuff rolls downhill.  He must have learned his lesson and

12    was endeavoring to teach it to me.

13          Without being, again -- and I agree with everything

14    that he said, I just have a few points that are pertinent with

15    respect to my particular case and my particular client.

16          In our case, your Honor, our codefendant, who, forget

17    about an omnibus conspiracy theory, but reasonably the two of us

18    are indicted together and were in a business together, is a UK

19    citizen.  And I understand that at the time of the search

20    warrants being executed in the United States, simultaneous

21    search warrants were being executed in the UK.  And I don't know

22    anything yet.  In fairness, we haven't actually had an

23    opportunity to raise the issue yet with the prosecutors, but in

24    our case the amount of documents that are seized as part of the

25    search warrants and that he would be entitled to review even

1    though they are in the UK is exponential because of the

2    locations that were searched in the UK.

3           Also, your Honor, I have not heard anything about text

4    messages, and I believe that that was an additional form of

5    communication, in addition to the e-mails and the voice mails,

6    and I am not sure what the Government's production will be of

7    those tapes.

8           Lastly, your Honor, I will say we have received the

9    tape recordings -- the phone calls, the recordings.  The quality

10   of them is fine and they are probably indexed.  I, again, echo

11   what others have said about, if we are in 16 small cases, you

12   know, what Mr. Dubelier's client or Mr. Weingarten's client said

13   is really of no moment to me.  That's the kind of decision that

14   the Government could make which would enable us to move these

15   cases along in a much more expeditious fashion.  Thank you, your

16   Honor.

17          THE COURT:  Very good.  Thank you, Ms. Prager.

18          Mr. Wisenberg.

19          MR. WISENBERG:  Hello, again, your Honor.  Sol

20   Wisenberg for Mr. Sacks, along with Michael Patrick.  We just

21   got into the case yesterday, each of us, and thank you for so

22   quickly granting the pro hac Motions as well.

23          Item number 1:  We don't concede complexity.  We don't

24   concede any exception to the Speedy Trial Act.  We don't -- we

25   remember that there is a Sixth Amendment Speedy Trial provision

1    as well, and we don't concede any of the Judge-made exceptions

2    to that.  Our opinion could change.  I don't think it will.  I

3    think I'm in a -- we are in a similar feeling right now, not

4    having seen the discovery of Mr. Dubelier.

5         I definitely echo Mr. Schertler's comments about, in a

6    case like this, particularly a case that's been investigated for

7    a long time and planned, about what should have been provided at

8    the time of the arraignment.

9         The prosecutors have been totally professional with us.

10   I haven't spoken to Ms. Perkins.  I have spoken to the other

11   two.  I am willing to concede that they are perfectly holistic

12   prosecutors, but that's just the way it is.  And I know it's too

13   early to litigate Speedy Trial, but there is stuff in the

14   legislative history of Speedy Trial that says, you know, the

15   more time you've got to plan for a complex case, you should be

16   ready to provide discovery.  And, again, I'm not conceding that

17   this is complex because, as your Honor has pointed out, and

18   others have, the charges are very simple.

19        We will be in Manassas tomorrow, Mr. Patrick will.  We

20   have already made our reservation.  I am also not happy that the

21   items are in Manassas, but we're going to be there at 1:00

22   tomorrow because we want to start looking at evidence.  We just

23   got in yesterday.  We got our CDs today.  We gave our hard drive

24   today, and we have been told we will get our hard drive back to

25   us tomorrow when Mr. Patrick goes to Manassas.

1        There will be -- our client, Mr. Sacks, is UK citizen.

2   There will be a bond Motion forthcoming fairly soon to allow him

3   to travel there and to -- and to live there.  And also, under

4   his current bond conditions, he can only travel from Florida to

5   D.C.  I would like him to be able to go to Manassas tomorrow,

6   but we can take that up later for housekeeping.

7        Is there anything else?

8        THE COURT:  That won't be a problem.  Don't worry about

9   that.

10       MR. WISENBERG:  Thank you, your Honor.  That's all we

11  have.

12       THE COURT:  Very good.  Thank you, sir.

13       Mr. Cohen I think is next.

14       MR. COHEN:  It was interesting to hear Mr. Dubelier

15  express what he expressed to your Honor.  About 25 years ago he

16  was a prosecutor in the Tulane basketball scandal case, and he

17  wasn't as quick to talk about giving that discovery in that

18  case.  I haven't seen him in 25 years, but I would never forget

19  his name.  Nice to see you again, Eric.  It's funny how the

20  world goes around, huh, Judge?  Judge --

21       MR. DUBELIER:  I said I learned, your Honor.

22       THE COURT:  Don't worry.  We are not in Virginia.

23  Relax.

24       MR. COHEN:  Let me start by saying how gracious the

25  prosecutor has been in this case.  I have spoken to her.  She

1   has been very nice and very cooperative.

2           Despite that, I am told that they FedEx'd a hard drive

3   to us.  And with all due respect, your Honor, those of us -- and

4   most of us have been around for a while -- we all know that the

5   amount of discovery that we are talking about here is not going

6   to be complete in eight weeks and we are going to be able to

7   come back and hear Motions.  These tapes you have to listen to

8   over and over again.

9           And if the Government is going to make transcripts, we

10  are going to make transcripts, and then we are going to be

11  comparing transcripts, and then you are going to be dealing with

12  search issues that we have been talking about, about Brady

13  issues.

14          The truth is, with all due deference to the Government,

15  that they put us in a very difficult position by the nature of

16  the indictment, by not having the discovery ready the way --

17  with all due respect to you -- that they should have.  And we

18  are in the position now of having to choose between waiving our

19  right to a Speedy Trial or getting a fair trial.

20          I would ask that the Court consider asking the

21  Government to do what they have to do to be able to inform us

22  and give us the proper notice as to what we are charged with,

23  who we are charged with so that we can not have to spend the

24  next eight months listening to all of this discovery.  We can

25  focus in on what we need to do and come here and defend our

1    clients the way they are entitled to be defended.

2          I don't think that's asking too much, your Honor, and

3    so I would respectfully ask that.  Thank you, your Honor.

4          THE COURT:  Very good.  Thank you, Mr. Cohen.

5          Mr. Bruce, do you have anything you want to add to

6    earlier statements?

7          MR. BRUCE:  Nothing additional.  Thank you.

8          THE COURT:  Very good.  Thank you, sir.

9          Mr. Dale, I think, is next.

10         MR. DALE:  Thank you, your Honor.

11         THE COURT:  Mr. Dale.

12         MR. DALE:  Your Honor, I will try not to repeat --

13         THE COURT:  Thank you.

14         MR. DALE:  -- what all the other lawyers have been

15   talking about.

16         As to discovery, the Government has been gracious and

17   been trying to turn it over.  We have received the hard drive

18   with all the phone calls.  I have listened to my client's phone

19   calls, and I will come back to that in just a second.  I agree

20   with Mr. Schertler and Mr. Leeper, Mr. Zeidenberg and probably

21   several others who have talked about Mr. Bistrong, and clearly

22   we would like that information to be included as part of the

23   discovery, especially the Brady and Giglio.  I can't tell you

24   how long it's going to take to review the documents.  Like many

25   of the other counsel, I don't intend to listen to 800 hours of

1    audio or video if I can help it.

2         So as to the timing, I don't know when we'll come back.

3    I do believe it's going to be up to the Government, for them to

4    decide what they are going to do with this case, and not for the

5    lawyers to decide.  I can tell the Court, however, that we are

6    not prepared, at least at this point, to concede Speedy Trial,

7    and we are not prepared to concede complexity of the case.

8         This brings me back to what I said before.  In

9    listening to the conversations -- I think there are 99 of them

10   in which my client is either talking or is referenced -- I hear

11   nothing there that ties him into a conspiracy with other

12   individuals.  This does seem to be 16 -- or at least, for my

13   client, a separate conspiracy, if there is a conspiracy at all,

14   and we don't concede that.

15        So I think it's really up to the Government, and

16   hopefully the Government will provide us with the other

17   information that we have requested.  Thank you.

18        THE COURT:  Thank you, sir.

19        Mr. Horstman is next.

20        MS. HORSTMAN:  Good afternoon again, Judge.

21        THE COURT:  Good afternoon.

22        MS. HORSTMAN:  Again, I am not going to repeat

23   everything everybody has said.

24        THE COURT:  Good.

25        MS. HORSTMAN:  However, I do want to focus on, for

1    Mr. Mishkin's -- on Mr. Mishkin's behalf, because he is the only

2    person named in his indictment, that a lot of the discovery,

3    like other counsel have said, is not applicable to him.  And

4    what I have reviewed, which I did get the hard drive yesterday

5    morning and I have started to review those calls -- I have not

6    received the CDs yet but, according to Ms. Perkins, I am

7    expecting to receive them tomorrow morning when I get to the

8    office.  Anything that I have reviewed so far I haven't seen any

9    connection to many of the other Defendants, if any of them.

10           And so I feel that the -- you know, we are not

11   conceding that this is a complex case or any type of waiver of

12   Speedy Trial at this point.  A lot of my evaluation of the calls

13   and of the discovery that we have received so far is, again,

14   going to depend on the Government's theory of this ambiguous,

15   you know, omnibus conspiracy or not because, from what I have

16   reviewed so far, I don't see any evidence of that so far.

17           The other thing I do want to focus on is the one thing

18   that is important, regardless of what -- if there is a

19   conspiracy or how big the conspiracy is -- is Richard Bistrong.

20   He is clearly the issue.  And to hear the Government not mention

21   any of the discovery about him is very disconcerting to me as

22   that is something that's obviously important regardless of

23   what -- the other issues that we have been discussing, the other

24   issues that other counsel have had.

25           So -- other than that, your Honor --

1          THE COURT:  Do you have any search warrant-related

2     issues?

3          MS. HORSTMAN:  I'm sorry, Judge?

4          THE COURT:  Do you have any search warrant-related

5     discovery issues?

6          MS. HORSTMAN:  Yes, Judge.  That is the second issue

7     that is going to be -- but, again, the Government has said that

8     they haven't started on that yet, so we also will be waiting on

9     that.  And I expect that to be voluminous because, you know,

10    they took everything from the business -- computers, files --

11    which will be massive.  And so that is also an issue, your

12    Honor.  Thank you.

13         THE COURT:  Very good.  Thank you.

14         I think next is Ms. Mederos-Jacobs and Lawrence Jacobs.

15         MS. MEDEROS-JACOBS:  Good afternoon, your Honor.  Our

16    office did receive some of the hard drives and the CDs which --

17    we received, actually, those today.  We did receive some

18    property that was returned, a computer from our client.  And

19    Mr. Jacobs has been in communication with the Government, and

20    she has been cooperative and quite gracious.

21         However, that doesn't belie the fact that the

22    Government has had in their possession, for a period of about

23    two years, evidence, recordings, CDs, e-mails, text messaging

24    for a two-year period, all these activities that were

25    orchestrated or fashioned Mr. Bistrong.  They have been in their

1    possession either personally or through their agent,

2    Mr. Bistrong, for a two-year period.  To come now before the

3    Court now and say that they need, minimal, eight weeks in order

4    to get it together to provide it to the defense is outrageous.

5            As former prosecutors, we also understand the burden

6    that they are under.  We've -- Mr. Jacobs was a prosecutor for

7    20 years, and I was a prosecutor for eight.

8            I have to agree with prior counsel before.  If you are

9    going to file an indictment or an information, you need to

10   provide the defense the evidence that you use in order to

11   formulate the indictment.

12           I am not really sure what explanation the Government

13   has provided to the Court, where they had this evidence for the

14   last two years, and why they need another eight weeks to prepare

15   it for the defense so that we can adequately represent our

16   clients.

17           Our client has also had some search warrant-related

18   discovery issues that we need to address with the Court.  And we

19   also have a housekeeping matter in that they have failed to

20   return his business records.  We could address at a later date.

21           We also needed to have the Government represent to the

22   Court whether the audio recordings provided are going to be

23   enhanced, if they are original, and if they are going to be

24   provided from every angle that the recordings were made.  Thank

25   you.

1          THE COURT:  Mr. Gorokhov -- I think is how it's

2     pronounced.

3          MR. GOROKHOV:  Good afternoon again, your Honor.

4          THE COURT:  Good afternoon.

5          MR. GOROKHOV:  I entered my appearance in this case

6     yesterday and received the discovery today.  I plan to start

7     looking at that discovery today as well.

8          My understanding, based on the Government's

9     representation, as far as video and audio involving my client is

10    quite limited, so I don't anticipate that's going to take that

11    long.  However, to echo what some of my colleagues have said,

12    it's important to get information on Mr. Bistrong.  It's --

13    search warrant issues may take a lot of time.  At this point, we

14    can't waive the Speedy Trial Act.  I believe we will be in a

15    much better position to tell the Court at the next hearing.

16         The last thing I would say, your Honor, is given that

17    the evidence -- by the Government's representation, the evidence

18    against -- the evidence involving my client is quite limited, I

19    think it's important for the Government to segregate that

20    evidence for me so that we don't have to waste extra time

21    reviewing items that aren't relevant.  Thank you, your Honor.

22         THE COURT:  Very good.  Thank you, sir.

23         Mr. Volkov, I think, is next, and Mr. Passanise.

24         MR. VOLKOV:  Good afternoon, your Honor.  Michael

25    Volkov for the United States -- for Mr. Alvirez.  Here is the

1   one thing that I have a big concern.  The Government has come in

2   here, your Honor, and basically they can't answer the basic

3   questions that need to be answered by the Court.  Number one:

4   Are you going to have a superseding indictment or not?  This is

5   trial by ambush in a sense.  These are -- you are not getting

6   straight answers to basic questions.  Okay?

7        The two questions are basically, who is a

8   co-conspirator?  Who is going to be charged together?  Rule 13 I

9   have never heard of as a way to bring together co-conspirators

10  in a case.  It's ridiculous.

11       In this courthouse, as you know, we have never tried --

12  there has never been a trial of more than -- other than the

13  Rayful Edmonds case way back in time -- of more than six to

14  eight Defendants at a time.  The Marshals have said we are not

15  going to do it.  Don't charge that many.  If you charge that --

16  more than that, we are going to break it up.  And that's the

17  rule.

18       So my concern is this.  We are told maybe we are going

19  to ask for a Speedy Trial exemption for a complex case.

20  Mr. Dubelier has it right.  I was never in his section, because

21  I was afraid of him -- okay?  All right?  And I didn't want to

22  work for him.  But the rule we had, when we had some of the

23  major gang cases here, was -- these were mega cases.  We had

24  everything ready to go.  We came in and told the Court right up

25  front, we are going to have a superseding indictment.  We are

1    going to break it up.

2        So, to me, there is a very simple answer here.  I mean,

3    I can go through the logistics of the discovery if you want to

4    hear all that, but it's pretty boring.  But there is a very

5    simple thing here.  This case is not under control, and the

6    control has to come from the Court to say, you have ten days.

7    Who is going to be indicted in what?  Who is going to be given

8    what?  And who are you going to trial against first?  And here

9    is your Motions date.  If you don't like it, file a complex case

10   Motion, let us an oppose it, and you decide, your Honor.

11       But this trial by Rule 13 -- we may come up, it will be

12   evident from the discovery -- is crazy.  I have never seen

13   anything like this.  It's up to the Court to hold the

14   Government -- to, you know, hold their feet to the fire and give

15   us some clarity.  It's not fair to make 22 people come back in

16   eight weeks -- and I will tell you what's going to happen then.

17   Everybody here is going to stand up and say, we need two months

18   to investigate Mr. Bistrong.  He is the key to this case.  He is

19   the entrapment of this case.  He is the honey that brought every

20   bee into this situation.

21       And there is no doubt we are going to need at least two

22   months to investigate him.  We have no idea what assurances he

23   has gotten.  He is off somewhere getting money right now.  I am

24   sure he is being paid.  And we don't have any idea what he is up

25   to.

1          So what I am saying is the Court -- I don't want to

2     spend a year on this case, I mean, frankly, doing discovery.

3     And it's up to the Court to take over and hold the Government --

4     you know, hold them to your standards.  That's the standard of

5     this courthouse.

6          THE COURT:  Very good.  Thank you, Mr. Volkov.

7          MR. PASSANISE:  He is an impassioned speaker.  I regret

8     having to follow him.  Joe Passanise, your Honor, on behalf

9     of --

10          THE COURT:  Can you imagine him and Dubelier together?

11          MR. VOLKOV:  That would have been bad news.

12          MS. PASSANISE:  Representing Mr. Tolleson, your Honor.

13     The U.S. attorneys have been very courteous to me.  They

14     provided the discovery today.  Obviously we can beat the horse

15     here several more times.

16          There are issues, in my particular situation, where my

17     client was an employee -- and I don't know if, in the discovery

18     materials -- there's going to be, obviously, an issue of getting

19     corporate records, things that he wouldn't have his hands be

20     able to touch or access.  And so that would be a concern.

21          I think it is very important, on all these different

22     recordings, if there was more than one mike, that is a crucial

23     issue because we have had cases where some mikes pick up

24     different conversations which are crucial to a particular

25     Defendant.

1          All that being said, it's very difficult for us to make

2     these decisions on Speedy Trial -- and I appreciate what the

3     U.S. attorneys say that it's not complex.  It is to some degree.

4     So thank you, your Honor.  We are learning, I guess, is the

5     motto for the day.

6          THE COURT:  Absolutely.  Thank you.

7          Mr. Madigan and Mr. McCool.

8          MR. MADIGAN:  Good afternoon, your Honor.

9          THE COURT:  Good afternoon, Mr. Madigan.

10         MR. MADIGAN:  I think we have all been learning, as

11    Mr. Krakoff said, and Reid and I have been doing this long

12    enough to -- I actually was involved in one of the earliest FCPA

13    cases where the -- one of the allegations was, in fact, the

14    delivery of a multi-million dollar aircraft to the President of

15    Gabon, who I believe President Bongo.  And, in that case, there

16    was a real President and a real country.

17         Since that time which was -- could have been 30 years

18    ago -- I have never seen a case, an FCPA case, where we were

19    accused of somehow conspiring to bribe a foreign official and

20    there is no foreign official.  So that's a situation that I

21    think, as much as we learn, we may not learn, or we may

22    ultimately learn, that, guess what, that's not a crime.

23         Now, I don't really know where to start with all the

24    deficiencies, but let me give you a little flavor of our little

25    client.  And Mr. McCool will, I am sure, add to that.  These are

1    two guys that have this little shoe-string LLC.  My client

2    doesn't even know, has never met, never spoken to

3    three-quarters, if not more, of these people indicted in this

4    matter.

5           The total amount of money involved in the little part

6    that he was involved in was something like $2,000.  And we are

7    now faced with this fellow, Bistrong, who apparently has been

8    working up his 5K arrangement for the last however many years,

9    and is -- there is no mention and no specific date which I

10   think -- and I will come back to that, your Honor -- specific

11   date for discovery from the Defendant.  I have already heard --

12   and, of course, we know a bit about Brady in this jurisdiction.

13   I have already heard at least one piece of Brady information

14   from Mr. Dubelier who says that this fellow told him the FCPA

15   doesn't apply to this transaction.

16          This fellow apparently has gone around and called and

17   called for several years, and the idea that the Government, you

18   know, hasn't produced it -- I think they should be ordered to

19   produce all of his discovery within 30 days.  And if they have

20   to go to Google, I echo whoever said they can't imagine that you

21   are allowing your 5K character to run around with Google

22   accounts not monitored by the FBI -- but I don't know what he

23   was doing.  But he is obviously the person that is -- you know,

24   has Brady lights written all over him.  And so we need that

25   information.  We need it in some specific time frame, which I

1    suggest 30 days would be such a time frame.

2           We also are just getting the discovery, but our piece

3    is so small that, you know, one of the things that I encourage

4    the Government to do is to go back and take a look at this and

5    get rid of some of the 22 Defendants.  I will state in court now

6    that we won't sue or do anything else when charges are dropped

7    against our clients, and, you know, that's a pledge that we will

8    live up to.  But we are a small little people that wouldn't even

9    recognize some of these other people.  And the only time that

10   many of these people were ever together was when they were lured

11   to some party and they may have seen somebody drinking somewhere

12   over on the other side of the room.  To say this is some kind of

13   vast FCPA conspiracy is complete nonsense.

14          What it is is a guy trying to work up his 5K -- a guy

15   you met, apparently, the other day in court.  And I am sure I am

16   leaving something out, but whatever I leave out, Mr. McCool will

17   add in.

18          THE COURT:  Thank you.

19          MR. McCOOL:  Good afternoon, your Honor.

20          THE COURT:  Welcome back.

21          MR. McCOOL:  I was sitting back there wondering whether

22   I should go the Volkov/Dubelier approach with the Court and

23   start, you know, pounding on the table, but that would be

24   expected, so I am going to sort of veer the other way, your

25   Honor, maybe shock you, but --

1        THE COURT:  You've shocked me before, McCool.

2        MR. McCOOL:  What's that?

3        THE COURT:  You've shocked me before.

4        MR. McCOOL:  I have.  I have.  I feel bad about that,

5   frankly.

6        THE COURT:  I don't think so.

7        MR. McCOOL:  I was sincere.  Your Honor, on behalf of

8   Mr. Morales, Stephen McCool, by the way.  With respect to Speedy

9   Trial, at this point there is -- we are not going concede

10  complex case, and we are not going to waive.

11        The other issues that I think all counsel have touched

12  upon pretty thoroughly is Rule 16, Brady, Giglio and 404(b).

13        I agree that the prosecutors have been very pleasant,

14  frankly, refreshingly so, but the fact remains that a lot of

15  these items should have been teed up and ready to go.

16        I think at this point what our request is, your Honor,

17  is for the Court to set dates certain:  When will Rule 16 be

18  produced?  When will Giglio be produced?  When will Brady be

19  produced?  And when will the 404(b) be produced?

20        I want to make clear with respect to the, for example,

21  Brady, I would like to know, on behalf of my client, is the

22  Government's position going to be that whatever Brady we have is

23  in these 805 hours of video or audio?  If that's the case, then

24  certainly that would be -- wouldn't be acceptable to the

25  defense, and we would want to know what their position is sooner

1    rather than later so that we can seek the appropriate relief.

2    We think that, you know, certainly looking for a needle in a

3    haystack wouldn't be appropriate.

4           And then the same with respect to the 404(b).  We would

5    want a specific notice.

6           With respect to Mr. Bistrong, your Honor, it's not

7    really clear, frankly because we haven't got any material on

8    him, whether or not he was acting as an unsupervised agent of

9    the Government.  If he has been, my concern is, if he was making

10   phone calls that weren't recorded, if he was sending e-mails or

11   receiving e-mails that weren't captured, certainly that would be

12   important for us to know.  Certainly as we move towards trial,

13   we would certainly seek the appropriate relief and an

14   instruction to a petit jury.

15          Then, finally, your Honor, with respect to -- I think

16   some of the counsel were talking about different -- all the

17   versions of the audio.  I think that there is forthcoming or in

18   Manassas there are videotapes of these meetings.  And, Of

19   course, we would request that all angles be produced on that.

20   If there is a body camera, for example, and then pinhole cameras

21   in the hotel rooms at different angles, I would like to see all

22   those angles.  That's all I have.  Thank you, your Honor.

23          THE COURT:  Thank you, Mr. McCool.

24          MR. MADIGAN:  Your Honor, can I just add on the

25   Manassas point that, as a D.C. resident, born here, I like never

1    to go outside of the District of Columbia unless necessary.

2    Really, the FBI building is one of the biggest in the world.

3    Why can't we have the material here so that, if we have to sort

4    through all that, we don't have to go to Manassas?

5            THE COURT:  It's a fair question.  We are going to get

6    to that.

7            Mr. Wainstein.

8            MR. WAINSTEIN:  Thank you, your Honor.  First, I would

9    encourage Mr. Madigan the come out to the Commonwealth of

10   Virginia every now and then.  It's a nice place to visit, and

11   we'll try to be courteous to him.

12           A couple of things.  In terms of discovery, I have

13   gotten the recordings, got them in pretty short order.

14   Fortunately, I actually got them delivered right before the

15   snowstorm hit, so we have been able to review a good number of

16   them.

17           Just to reiterate a couple of the points that were

18   made, first, just to put sort of a finer point on it, in the

19   entrapment, there is going to be a viable entrapment defense

20   here, and so a lot of that is going to ride on Mr. Bistrong.  So

21   it is absolutely critical that we get as much as we can about

22   Mr. Bistrong as quickly as possible.

23           Then, in terms of the Government's decision whether to

24   supersede and try to consolidate this case, once again, just

25   sort -- not to put too fine a point on it, but that is going to

1    dictate everything when it comes to whether this is a complex

2    case because, if they do, I think there is going to be very

3    active and involved litigation challenging that indictment, and

4    that's going to necessitate all of us who might challenge it to

5    go listen to all those tapes, because all are going to be

6    relevant as to whether there are sufficient ties between all the

7    co-conspirators.  So that's really going to drive everything,

8    and so I would add to the encouragement that that decision be

9    made as soon as possible.  Thank you.

10           THE COURT:  Thank you, Mr. Weingarten.

11           Who will speak for the Government?

12           MR. SOLOMON:  I will, your Honor.

13           THE COURT:  Mr. Solomon.

14           MS. SOLOMON:  Just to respond briefly, your Honor,

15   again, most Defendants have been provided with substantial

16   discovery already in this case, including the key meetings

17   referenced in each of their indictments where they agreed to pay

18   bribes and where they were told that the bribes they had paid

19   had been received.  And just to emphasize, the CDs we provided

20   are not just the meetings for each individual Defendant, or two

21   Defendants, as is the case with some indictments, but all of the

22   charged Defendants, all of the conspirators.

23           So to say that the Government hasn't indicated through

24   discovery who these people are, it's evident that some of

25   counsel have not yet had a chance to look at that discovery.

1    They only received it yesterday, that's fine, but I am not going

2    to litigate today what the contours of the conspiracy are when

3    counsel have not yet even looked at the discovery that we have

4    provided so far.

5         And, frankly, your Honor, I think that is an issue, if

6    it becomes an issue, whether it's one conspiracy or, as certain

7    defense counsel may allege down the line if there are trials,

8    multiple conspiracies -- that may be a jury issue down the line,

9    your Honor, but for purposes of what we are doing here today,

10   the Government has told the Court clearly this is one

11   conspiracy.  The Government elected at the onset not to join all

12   of the conspirators under Rule 8(b) -- and that's a permissive

13   rule.  There is no prejudice for the Government to come to your

14   Honor and ask your Honor to consolidate cases under Rule 13, or

15   obviously to request superseding indictments ourselves from the

16   Grand Jury.  But as your Honor notes, to have indicted 22 people

17   together in one indictment and try to try that case would be

18   absurd.  So not wanting to walk away from people who had

19   committed serious crimes, your Honor, that's how we elected to

20   charge the case.

21        THE COURT:  How do the indictments that exist so far,

22   as they currently stand, how do those indictments inform the

23   defense counsel and the Defendants, and the Court, frankly, as

24   to what the Government's theory is as to how these 22 Defendants

25   interacted with one another other than in those cases where

1    there are multiple Defendants, which is only a couple of cases,

2    actually?

3            MR. SOLOMON:  Correct, your Honor.

4            THE COURT:  So how, for example, would Mr. Goncalves,

5    Amaro Goncalves, the first case -- I am just going by, you know,

6    the order here -- and then Mr. Pankesh Patel, the next single

7    Defendant case in the order of my list here -- how would they

8    know, based on what they have -- they have an indictment against

9    themselves individually, but there is nothing on the face of

10   that indictment that suggests in any way or informs them in any

11   way that anything they said or did constituted a conspiratorial

12   act vis-a-vis one another, Mr. Patel to Mr. Goncalves.  How do

13   they know that?

14           MR. SOLOMON:  I do understand your Honor's point.  It

15   is not typical a indict this many Defendants who are a part of

16   one conspiracy in separate indictments.  But read carefully,

17   each of the indictments does allege that the conspirator or

18   conspirators, if it's two people together, were conspiring with

19   others known and unknown to the Grand Jury as charged.  They

20   were found to have committed the offense of conspiracy to

21   violate the FCPA and money laundering conspiracy by a Grand

22   Jury.  There are allegations in each of the indictments that the

23   Defendants knew other people were involved in the deal to supply

24   products to country A.  There are allegations in each of the

25   indictments that each of the individual Defendants supplied just

1    a portion of the goods that were going to go to country A.  So

2    on a $15 million deal -- and that information was conveyed to

3    each of the Defendants, and that's in the indictment -- each of

4    the Defendants knew they were only supplying a portion of those

5    goods.

6          So we believe the Defendants are on notice, by virtue

7    of the indictments themselves, that there are other

8    co-conspirators.  And they were arrested with their other

9    co-conspirators.  They are sitting in this courtroom today with

10   their other co-conspirators.  And the discovery is going to

11   indicate, when counsel looks at it, who those other conspirators

12   are and what they said, how they agreed to pay bribes and how

13   they were told, after they agreed to pay bribes, that their

14   bribes were, in fact, paid.  So we think that there is ample

15   notice of one conspiracy at this point.

16         Now, one defense lawyer has requested that we grant

17   additional time or agree to additional time to file a Bill of

18   Particulars, until March 24th, and we thought that was eminently

19   reasonable.  That would give counsel time to look at the

20   discovery we have provided and to make an assessment about

21   whether or not they believe they needed additional information

22   about who the other co-conspirators were and what their role

23   was.  And we assume that a Motion for a Bill of Particulars will

24   be filed if that information is still needed after review of

25   discovery.

1      But our position is we have provided ample notice, and

2   we will in the near future, your Honor, make a decision and

3   notify the Court about whether or not we will seek Rule 13

4   consolidation.  Of course, we always have the opportunity to go

5   back to the Grand Jury and seek superseding indictments.

6      But we are in discussions right now with a number of

7   counsel about possible dispositions.  We believe that's going to

8   streamline the case.  We do not believe 22 people are going to

9   go to trial in this case, your Honor.  And we want to be able to

10   make an informed decision, whether it's through your Honor and

11   Rule 13 or through superseding indictments, about how best to

12   parse -- segregate out Defendants appropriately for trial.

13      We agree 22 would not work.  A smaller number might.

14   But, again, our position, your Honor, is one conspiracy -- we

15   believe the case law will support us on that.  And for purposes

16   of pleading and for purposes of Rule 8(b) joinder, if we get

17   there on Rule 13, and that there be the analysis -- could they

18   have been indicted together in the first instance? -- we will

19   make that showing, your Honor, at the appropriate time.

20      THE COURT:  So if Mr. Goncalves' counsel -- again,

21   going back to my earlier analogy, if Mr. Amaro Goncalves'

22   counsel were to review the discovery he is receiving and not be

23   able to discern who else, besides the cooperator and the FBI

24   agent he allegedly was involved in a conspiracy with -- if he

25   can't figure it out, for whatever reason, it's just two

1    amorphous, how is he going to find out that?  Are you going to

2    tell him?

3         MR. SOLOMON:  Well, he will need to file a Bill of

4    Particulars, your Honor, and we will give the additional

5    information that we are required to give before trial, giving

6    notice about what contours of the conspiracy are.  We don't

7    believe we are going to be required to try our case before there

8    is an actual trial to determine -- it is for a jury, ultimately,

9    if your Honor were to give an instruction ultimately whether

10   there is one or multiple conspiracies -- we are nowhere close to

11   that point, your Honor.

12        We believe we have made a sufficient pleading, showing,

13   based on the indictments and other representations, that it is

14   one conspiracy.  And if we get a Bill of Particulars, we will

15   respond to it.

16        And we have had conversations with many counsel, and we

17   have actually sat down with several of them and we have walked

18   them through the evidence for their particular client.  And that

19   discussion could certainly include discussions of that

20   conspirator's relationship to other conspirators.  But it's

21   black letter law, your Honor -- and your Honor knows this --

22   that just because you don't know personally other members of the

23   conspiracy doesn't mean you can't be part of a conspiratorial

24   agreement.

25        And what's alleged in this case, in these indictments,

1   is that there were was one $15 million deal to supply products

2   to a country in Africa, country A.  Each Defendant participated

3   in that.  There are several interrelationships among the

4   Defendants will be apparent through discovery.  I am not going

5   to walk through them all today.  We will be happy to walk

6   through the evidence, as we have done with counsel.  So perhaps

7   before counsel pre-judges the evidence and pre-judges our

8   conspiracy theory, they should talk to us.  We would be happy to

9   have that opportunity.

10          And I just want to emphasize, we have made available

11   all of those meetings from the indictment, backup documents for

12   the indictments, such as the invoices that are referenced there.

13   We have made available 302s.  We have let all counsel know, who

14   have asked us, that they are welcome to review any video of any

15   meeting, so long as we can find an agent to work with them.  And

16   we have been able to accommodate everybody who has asked to do

17   that so far, and we will continue to do so.

18          THE COURT:  What about this Manassas issue?  Why can't

19   it be brought into the city here?

20          MR. SOLOMON:  I could talk to the FBI about that, your

21   Honor.  I don't know if that's practically possible.  And I

22   concede -- I am born and raised in D.C. myself and get lost

23   every time I go out to Virginia, pretty much, so -- but I have

24   figured out how to get out there.  It's a 30-minute straight

25   shot from downtown.

1    I will talk to the FBI to see if any provisions can be

2    made to move some of that evidence to the WFO.  I just don't

3    know if it's practically possible, so I don't want to commit to

4    it.

5         THE COURT:  This is evidence that's being stored

6    temporarily there?  Is that -- pre-duplication?

7         MR. SOLOMON:  It's evidence that's been collected there

8    over the course of a two-and-a-half-year undercover

9    investigation, so it's a large volume of evidence.  And I have

10   seen the room or rooms where this evidence is, and I just don't

11   know whether it would be feasible to move some of it to the WFO.

12   We could inquire about that and let the Court know.

13        We want to be as accommodating as possible.  It just

14   wasn't physically possible, through a two-and-a-half-year

15   undercover investigation, to think that the FBI, on a rolling

16   basis, was going to make 22 copies of every recording that they

17   did.  It wasn't going to happen.

18        And I don't know how it was in Mr. Dubelier's day, but

19   the budget would not have permitted that to happen.  It just was

20   never going to happen.  It's an undercover operation, your

21   Honor.  We are doing our best to get a critical mass of

22   discovery information to the lawyers so that they can make an

23   assessment about their client 's culpability, and we will

24   continue to do that.

25        On this point --

1          THE COURT:  What about the search warrants, the product

2    of the search warrants not only in the United States but in the

3    UK and wherever else they were conducted outside of the United

4    States?

5          MR. SOLOMON:  As for the UK warrants, that information

6    is not in our custody, so I am not certain we have a discovery

7    obligation with respect to that.  And obviously, if we do, we

8    will fulfill it.  I don't think we do.

9          As far as the U.S. search warrants, that material has

10   to be copied, and that will take some time.  And we will

11   endeavor to get that information copied as soon as possible.

12         A large volume of information was taken from several

13   search locations involving several conspirators, and we are

14   going to need to, with alacrity, get that information copied.

15   And we have tried to do that so far, your Honor.  We will keep

16   doing that.

17         And on that issue, Speedy Trial Act, we recognize that

18   it is a large volume of discovery.  We are alleging it's one

19   conspiracy.  That's what it is, and that's what the evidence

20   will show.  So we are going to make all the evidence available

21   to every Defendant, naturally.

22         Now, that's going to take some time, and we will make a

23   decision whether or not, in very short order, we will file a

24   Speedy Trial Act Motion for discovery purposes, to have your

25   Honor make an interest of justice finding for at least purposes

1    of getting the bulk of discovery out the door to defense counsel

2    so that they can make their assessments.

3         Now, if counsel want speedy trials, we will accommodate

4    those.  That's their right.  And our recommendation would be, at

5    the next status, to set a briefing schedule for those Defendants

6    who want speedy trials.  And those will be the people that we

7    will deal with principally to get them into the FBI and look at

8    the information as quickly as they can.  And for those things we

9    can't provide copies on, we will provide people to sit with them

10   for as long as they need to to sift through the evidence, and we

11   will give them as much direction as we possibly can on that.

12        But I am not sure what else we can do, your Honor,

13   given where we are.  This information was never going to be

14   ready at indictment to give to everybody in a

15   two-and-a-half-year undercover investigation.  I wish that

16   weren't the case, but that's just the reality.  And we will do

17   everything we can to try to make the information as accessible

18   as possible and as quickly as possible.

19        THE COURT:  When will they receive the Brady material,

20   each Defendant individually?

21        MR. SOLOMON:  We are going to -- we have been out to

22   the FBI once already to look through the cooperator's file.  We

23   are going to go out there again next week.  We need to determine

24   what we have to turn over.  And we are not taking any chances.

25   Anything we think we are going to turn over -- we think should

1   be turned over will be turned over.  We will be permissive.  And

2   we need to get that information copied, put on a disk and sent

3   out to counsel.

4        I can't promise how quickly that will happen.  I know

5   that it's about a table full of information for all the files

6   for the cooperator.  So we will read through it, make the

7   copies, and get it out as soon as practicable.  We understand

8   that counsel wants to look at that information, and of course,

9   they are entitled to it.

10        On the issue of Google, your Honor, there has been some

11  insinuation that the Government has somehow had this cooperator

12  running willy-nilly and sending e-mails to them.  Of course, the

13  cooperator has been monitored by the FBI.  We merely subpoenaed

14  Google and Yahoo! to make sure that we had every single e-mail

15  that the cooperator sent so we could turn everything over at

16  once.  We probably have it all now, but belt and suspenders, we

17  wanted to go ahead and subpoena the provider to make sure we had

18  everything.  That's the hold-up on that.

19        We can certainly get started with the production

20  without getting a disk from Google and a disk from Yahoo! saying

21  the production is complete, but we thought it might be more

22  user-friendly and put us in a better position to be able

23  represent you have every e-mail this person set on these managed

24  accounts.  That's what that is about, your Honor.

25        And in terms of angles being provided for videotapes,

1    of course we are going to provide every single angle, and I

2    don't think my colleague meant to, and I don't think she did,

3    insinuate that they're only getting one angle.  We are trying to

4    give them everything.

5         THE COURT:  How about multiple microphones?

6         MR. SOLOMON:  Absolutely.  Absolutely.  They will have

7    every recording.

8         Now, are we going to have a transcript ready of

9    everything?  No.  We don't have that for ourselves, your Honor.

10   Again, it's just not realistic.  It's not the world we live in.

11   But when we make transcripts -- and we will make them before

12   trial for key conversations relating to the country A deal --

13   they will get them.  And then they may want to do their own

14   transcripts, and that's their right.

15        THE COURT:  How many lawyers do you have ready to try

16   these cases?

17        MR. SOLOMON:  Well, we have three here, your Honor.  We

18   will get as many lawyers as we need.  We will get this done.

19   And again, we understand 22 people --

20        THE COURT:  Do you think you could handle 16 weeks in a

21   row of trials, 16 two-day or three-day trials?

22        MR. SOLOMON:  Yes, your Honor.  Absolutely.  We will

23   have the staff to get the trials done.  We don't think there are

24   going to be 16 trials.

25        And you have heard a lot of -- well, you have heard a

1    lot of statements today from counsel, and I think, if we revisit

2    this issue a few weeks out, we might be in a different posture.

3    Certainly the Government will be in a better position to know

4    what it's going to do about attempting to consolidate cases.

5    But you see we are damned if we do and damned if we don't

6    because if we came in and indicted 22 people, your Honor would

7    be very displeased, and then we'd face severance motions.

8          And so we will proceed in the most logical way we can,

9    trying to get people the information they need.  We urge them to

10   call us.  We urge them to call us.  We will sit down and talk to

11   them and walk them through the evidence.  The agents will talk

12   to them and walk them through the evidence.  Nobody is playing

13   hide the ball here.

14         And if you carefully read the indictments, read all of

15   the indictments, the allegations are there that this was one

16   conspiracy.  That, coupled with the evidence that we have

17   provided in discovery, and will continue to provide, should give

18   them all the notice they need pretrial.

19         THE COURT:  Well, to the extent it's of any comfort to

20   you, or assistance to you, I read all 16 indictments and I

21   didn't see it.  So -- I don't have an ax to grind.

22         MR. SOLOMON:  I understand, your Honor.

23         THE COURT:  They represent clients.

24         MR. SOLOMON:  I understand.

25         THE COURT:  I don't.  I read the 16 indictments, and I

1    had zero -- zero sense that there was an omnibus grand

2    conspiracy between and among all of these parties.

3           Now, I hope that will be of some value to your office

4    when you are discussing this with Mr. McInerney and Mr. Brewer

5    and whoever else you are going to talk to about it.  But I don't

6    want there to be any doubt in your mind about it.

7           MR. SOLOMON:  We understand, your Honor.

8           THE COURT:  You can quote me on that.  What you think

9    is so transparent is not, and you need to take a step back, your

10   whole team, and realize that you are so close to the trees you

11   might not see the forest.  I am telling that to you not only for

12   your own good, but in the interest of justice for all the

13   parties here today.

14          Now, my reporter has been working nonstop for two

15   hours.  We are going to take a ten-minute break.  When I come

16   back, I am going to give you some deadlines.  You better have a

17   lot of lawyers ready to work.

18          MR. SOLOMON:  Thank you, your Honor.

19          (Recess.)

20          THE COURT:  All right, Counsel.  Get your calendars

21   out.  At the last hearing -- I guess it was two weeks ago,

22   roughly -- I gave you all fair notice that, with this number of

23   lawyers, I am not going to be able to accommodate everybody's

24   schedule.  So -- I am stating the obvious.  So you are going to

25   need to have backup, whether it be in your own firm or local

1    counsel or whatever.  There just simply isn't going to be the

2    ability to pick days and hours within days that everyone can be

3    here.

4           So I am anticipating that there will be some dates that

5    I will pick where someone is going to have to be in Los Angeles

6    or something like that.  Well, you are going to have to have

7    someone else who can cover for you.  That's just the nature of

8    the beast in cases of this magnitude and complexity with the

9    schedule.  I think you all know that.  You have all been around

10   town a little bit.  So -- but I am just stating the obvious.

11   Our next get-together will be March 22nd at 2:00.  It's a

12   Monday.  But a lot is going to have to be done by March 22nd.

13          First of all, by March 10th, the Government will

14   produce all Brady, Giglio, Rule 16 materials relating to

15   Bistrong.  That will give counsel 12 days to review that.  Now,

16   this is over and above and in addition to producing, on a

17   rolling basis, all Rule 16 discovery that they already owe

18   counsel, but I don't want there to be any question in anyone's

19   mind about the Bistrong-related material that we have heard a

20   lot of talk about today.  They have got till March 10th to

21   produce those to each and every defense counsel.

22          By the time we get together March 22nd, you will have

23   had almost two weeks a review them.  There will be no excuse for

24   not having reviewed them.  Everybody will have had a chance to

25   get a clear sense of what's out there as it relates to your

1    client and, in particular, as it relates to this particular key

2    piece of the Government's case.  Now, again, this is over and

3    above what they are producing on a rolling basis.

4         And in particular, in that regard, I want the search

5    warrants that were recently executed in various far-flung places

6    around the country -- I want those materials to be produced to

7    counsel also by the 10th.  Now, I realize that might cause

8    logistics issues -- and we will see as time goes -- but that's

9    the goal, and I want it produced by the 10th of March so that

10   everyone has whatever it is that any search that was conducted

11   of anyone's business or their individual residence or their --

12   wherever -- is produced to them and available for their review

13   by the 10th of March.

14        Now, on or before the 22nd, the Government is to inform

15   the parties in writing, and the Court, whether or not they

16   intend to seek a superseding indictment, whether or not they are

17   going to seek to consolidate, under Rule 13, or in any

18   reformulate the existing indictment in the case.  When we get

19   here on the 22nd, we are going to know the answer to that

20   question.  We will know the answer to that question.

21        Then a Motion for a Bill of Particulars will be

22   fileable no later than April 2nd, based upon what you have

23   reviewed, based upon the evidence you have seen, based upon the

24   Government's decision about superseding, reformulating,

25   consolidating, whatever verb you want to use, you will have two

1    full weeks to file your Motion for a Bill of Particulars.

2          Now, getting back to Motions, though, for a second, the

3    Government is to file, by March 10th, any Motion it may seek to

4    file -- and this would apply to defense counsel who want to file

5    by the 10th, but I am not requiring them to do it -- a Motion

6    for an exception under the Speedy Trial Act for a complex case

7    status.

8          So on March 10th, the Government has to file -- if they

9    are going to file one, if they are going to seek that exception,

10   they have got to file it that day.  If any defense counsel wants

11   to seek an exception as well, they can file it that day, too,

12   but they have ten days to respond.  If they are objecting to a

13   Government Motion for an exception to the Speedy Trial Act

14   that's filed by the 10th, they have got until the 22nd to file

15   their opposition.  That's the day we are meeting.  All right?

16         So if the Government is seeking an exception, you have

17   got ten days to respond.  And in that regard, I want to get to

18   the next issue.

19         I want the defense counsel -- I don't want.  I am

20   ordering the defense counsel to meet, just the defense counsel,

21   to discuss common issues that may need to be briefed in this

22   case and any appropriate approach to dealing with those issues

23   before the Court.  It doesn't make sense if, for example, there

24   are, say, entrapment issues that are common in every single

25   case, hypothetically -- I am not telling you what your position

1    should be, obviously, but if the defense counsel meet and they

2    all agree there is an entrapment issue common to this case, I

3    don't want 22 briefs for the defense.  I want one consolidated

4    brief for the defense and one consolidated brief for the

5    Government on that common issue.

6         If there is a common discovery issue -- let's say it

7    relates to Bistrong in a hypothetical setting -- I want the

8    defense counsel to meet and see if they can reach any agreement

9    or accord among them as to what common issues there may be of a

10   discovery nature and how they might be able to divvy up the

11   labor in that regard.

12        Now we did this in -- we have done this in the

13   Guantanamo detainee cases for some issues where we had multiple,

14   multiple parties being represented on the very same issues.  And

15   it just doesn't make a lot of sense to have 22 briefs on

16   entrapment, 22 briefs on a particular issue that may affect

17   every single one of the cases here.

18        So I am ordering the defense counsel on at least one

19   occasion to meet and confer on common issues of law, common

20   issues of law, common issues of procedure that apply to all

21   16 cases, to the extent they can discern it, and see if they can

22   come up with an approach so that, when those are litigated --

23   and they will be litigated; there is no question in my mind --

24   that the Court will not have to go through 22 briefs on the same

25   issue.  First of all, it's not cost-effective for your clients,

1   it's not time-effective for this Court for me to be going

2   through 22 briefs on the same issue.  It doesn't make any sense.

3   And the Government, of course, is not going to write 22

4   responses to 22 different briefs.  They're going to write one

5   consolidated brief.

6          Well, then, if they are going to do that -- and that

7   makes perfect sense -- and that's we do in all these

8   multiple-Defendant case anyway -- then there should be

9   essentially, to the extent possible -- and I stress that phrase,

10  to the extent possible -- one brief on a common issue of law or

11  procedure for the defense, one for the Government.

12         So talk about it among yourselves, see if you can come

13  up with -- and be prepared to have someone, or a couple of

14  people, address that issue or be available to address that issue

15  when we meet on the 22nd, because I am going to be asking for

16  your thinking on the subject.

17         So, for example, on Bill of Particulars, you might

18  agree among yourselves that, look, you know, this is a common

19  issue to all of us.  We all think a Bill of Particulars is

20  necessary here and, you know, these are the aspects to it that

21  we believe are common and et cetera, et cetera, and I think one

22  pleading might make sense.

23         I think that's going to be more efficient and it's

24  going to be more cost-effective for the clients and more

25  efficient for working through these issues because, obviously,

1    there are going to be fundamental issues that have to get

2    resolved up front before we get to the point where we are ever

3    even talking about scheduling trials.

4            If we need schedule 16 mini trials -- well, I think

5    that's what Mr. Dubelier referred to -- and that's two- or

6    three-day trials -- we can do that; we can do it.  But we are a

7    long way from doing that.  There is a lot of water that has to

8    get over the dam before we ever get to the point of scheduling

9    16 trials in a row.

10           So there's going to be a Motion either filed or not

11   filed by the Government by the 10th.  Defense counsel are

12   welcome to file theirs, too, if they want to, by the 10th.  They

13   don't have to, but if they want to, they can.  But if the

14   Government files its Motion, you have got 12 days to respond,

15   and that's the 22nd when we actually confer.

16           Now, the Manassas issue.  I really don't -- I don't

17   really think it makes a lot of sense for judges to be

18   micromanaging where the FBI stores its records that it has

19   obtained in the course of an investigation on the one hand.  But

20   this is not an everyday case to say the least.  I think the

21   Government, by its own characterization, said it was the largest

22   FCPA case in history, in one of its press releases.

23           Look around this room.  It's not a normal case.

24   There's a lot of lawyers here.  There's a lot of Defendants

25   here.  We don't have hearings in this kind of room ever, really,

1    on criminal cases.  This is very unusual.  I think that calls

2    for unusual effort.

3         The FBI has a huge building right here on Pennsylvania

4    Avenue, and they have a huge Washington field office right back

5    about four blocks from here.  I think some special efforts

6    should be made to see if there is a way to have the materials

7    that need to be reviewed by counsel, such as audio equipment --

8    I mean audiotapes, videotapes put into a secure location in one

9    of those big buildings so that the counsel, most of whom

10   practice law right here in Washington, can logistically be in a

11   better position to go and review them and review them with their

12   clients, too.

13        So I would strongly urge -- I am not going to issue an

14   order on this right now, but I would strongly urge the Justice

15   Department to get the FBI to make every possible effort, every

16   possible effort to find an adequate space in one of those two

17   buildings -- or they may have another building.  I don't know.

18   I know of two buildings, certainly, right within close proximity

19   to this courthouse.  And I really think that's in everybody's

20   interest to do that.

21        I think those are essentially the -- at the moment,

22   anyway -- there is a lot that's going to become clearer as we

23   move down this path, and I fully expect that when we reconvene

24   in a month, basically, you will know a lot more and you will

25   have more issues.  And hopefully some issues will be resolved.

1          So I think it's just -- we are just at a point now

2     where there is still -- a lot of you have just gotten these

3     materials, by your own admission, haven't a chance to really

4     review them yet, need a chance to review them carefully.

5     Certainly, the defense counsel need to review them before they

6     can meet and confer on common issues of law and common issues of

7     procedure that will need to be challenged and briefed under the

8     circumstances.

9          Some of you have already raised issues with regard to

10    just fundamental theoretical questions about entrapment and

11    conspiracy in this kind of factual scenario, as set forth in the

12    existing indictments right now.  So I am optimistic that you

13    can, if you meet and in good faith work together, you can

14    identify common issues and maybe come up with a proposal on how

15    to deal with it to keep the briefing to a minimum in terms of

16    the number of briefs and focus it so that the Court can resolve

17    the common issues in a way that enables this series of cases --

18    that's what I will call it; right now, it's a series of cases --

19    move forward in the most efficient manner possible.

20         It's going to be -- it's obviously going to be a

21    management challenge.  This is a very challenging scenario for

22    any Court, and it's going to take hard work on the part of not

23    only the Government's counsel, but the defense counsel, to work

24    well under these circumstances.

25         Now, we have some what I think have been characterized

1    as housekeeping-type issues, so I will deal with those on a

2    case-by-case basis.  Mr. Leeper, I think had one.

3              MR. LEEPER:  Thank you, your Honor.  I just need one

4    more minute of your time.  We have a representative of Pretrial

5    Services here to accommodate the request I am about to make.  My

6    client, Jeana Mushriqui resides in Upper Darby, Pennsylvania,

7    along with her brother, John Mushriqui, who is represented by

8    Mr. Krakoff, but they are members of a religious congregation,

9    St. Mark's, out in Fairfax, Virginia, and we would like the

10   Court's permission for them to travel from Pennsylvania to

11   attend services at St. Mark's in Virginia, as well as to attend

12   retreats that St. Mark's has in Maryland on a periodic basis.

13             And I understand the Government does not object to that

14   relief, but I will let the Government speak for herself or

15   himself and, as I say, Ms. Sucato is here from Pretrial Services

16   to reflect their assent to that request.

17             THE COURT:  All right.  Ms. Perkins, do you have a

18   position on that?

19             MS. PERKINS:  The Government has no objection to that,

20   your Honor.

21             THE COURT:  Very good.  That will be granted.

22             MR. CALLI:  Paul Calli on behalf of Steve Giordanella.

23   You know, this is less a housekeeping issue and more a

24   date-setting issue.  And I have discussed this with Ms. Perkins,

25   but while the Court is sort of setting firm or at least control

1    dates, I thought I would bring this up.

2          Early in our conversations with her, Ms. Perkins used a

3    four-letter word, 404(b), and so I have talked to her about when

4    the Government would intend to make us aware of any such

5    information and file the appropriate papers.  These dates the

6    Court has set seem to make sense in the vein of moving the case

7    forward and controlling the flow of information.  So I would ask

8    the Court to consider setting a date today that the Court deems

9    reasonable to give the government a fair opportunity, in light

10   of these other deadlines, but we -- you know, we are real

11   interested in knowing that -- what the government believes it

12   has, and that's going to be a source of some litigation for

13   anybody, I would imagine.

14         THE COURT:  And this as it particularly relates to

15   Mr. Bistrong?

16         MR. CALLI:  No.  I don't know.  I know that the

17   Government has mentioned the potential for it to seek the

18   introduction of 404(b) evidence against our client.  So -- you

19   know, I don't know what that means.  I don't know what their

20   theory is, but I think it makes sense, in light of these other

21   discovery Motion deadlines, for that to come out so we can begin

22   moving forward with Motion practice on that issue if necessary.

23         THE COURT:  All right.  That's fine.  Ms. Perkins, do

24   you have any thoughts on that subject?

25         MS. PERKINS:  Your Honor, the Government has produced

1   and will be producing the evidence that may be 404(b), maybe

2   inextricably intertwined evidence with regard to the Defendants.

3   So the actual evidence has been produced at this point, and will

4   be produced throughout the discovery process.  That's some of

5   the tapes that I was alluding to that do not relate to the

6   charged deal, but are other deals, your Honor, that the

7   Defendants discussed with individual 1 and with the undercover

8   agents.

9        All of that evidence is being made available.  We just

10  have not laid it out in a formal notice at this point, your

11  Honor.  And as I told counsel, we would file that notice as we

12  get closer to trial within a reasonable time of trial as

13  required, your Honor.

14       THE COURT:  Yeah.  All right.  I am not going to

15  require that at this moment, but there will probably be a

16  requirement that it be produced a lot earlier than trial, that's

17  for sure.

18       I think there is so much right now that has to be

19  reviewed -- and you are going to have all the Rule 16, any

20  Brady, Giglio materials by March 10th -- you are going to be

21  very busy with lots of things by then.  And I think at this

22  point -- I am not going to require the Government to produce any

23  404(b) evidence at this point.

24       I mean, obviously, you have access to your clients and

25  you have access to whatever knowledge your clients wish to share

1    with you.  So, you know, defense counsel know how to take the

2    necessary steps to learn as much as they can prior to any

3    productions.

4           Mr. Weingarten.

5           MR. WEINGARTEN:  On behalf of Mr. Paz -- this follows

6    from our discussion this morning.  As you may recall, you gave

7    us Friday at 11:30 to produce Mr. Nolan.  We've assiduously

8    sought out Mr. Nolan.  Mr. Nolan will be Georgia with a

9    Government agency on something that can't change.  I would like

10   to hold the date and the time because we will also assiduously

11   seek an agreement with the Government, and perhaps come in court

12   on Friday morning and seek a blessing and, if not, be in a

13   position to argue aggressively that, with or without Mr. Nolan

14   being present, our client should be released.

15          THE COURT:  All right.

16          MR. WEINGARTEN:  So I will like to hold that date if

17   possible.

18          THE COURT:  You can hold it.

19          MR. WEINGARTEN:  I advised the Court on Monday -- and

20   that was the second date -- if Mr. Nolan is necessary -- I can't

21   change somewhere I have to be, but Mr. Heberlig would be there.

22          THE COURT:  That's fine.

23          MR. WEINGARTEN:  Finally, the Marshals have advised us

24   that our client, Mr. Paz, is now being held at D.C. Jail, and

25   that's where they are intending to bring him back to.  Because

1    it's not the greatest place to work with him, and we are eager

2    to sit down and talk about the evidence, I'd respectfully

3    request an alternative order.  And our first preference would be

4    the Eastern District of Virginia.  If that's not reasonable, the

5    CTF right next to the D.C. Jail would be preferable in terms of

6    working with our client.

7         THE COURT:  Well, regrettably, the Court is not in a

8    position to order the Marshal Service to put him in CTF.  I can

9    recommend -- the most I can do is recommend that he be held at

10   CTF between now and Friday.  And that's all I can do at this

11   point in order to help facilitate your ability to meet with him

12   under the circumstances.

13        But depending upon what happens Friday, I can recommend

14   it again for the weekend.  But I can't order them.

15        Mr. Cohen.

16        MR. COHEN:  Your Honor, Barry Cohen for John Wier.

17   Last time I was here, your Honor directed me to meet with the

18   Government regarding the bond modification.  We have done that.

19   And Ms. Perkins has agreed -- I will let her speak to the Court

20   on that herself, but we are asking the Court to modify his

21   conditions so that he can go to work where his usual place of

22   business is, where he works.  He will be restricted to the State

23   of Florida.  He will not leave the country to go

24   internationally.

25        THE COURT:  He has turned his passports in, right?

1     MR. COHEN:  He has surrendered his passport, is my

2  understanding.  Right, John?  Yes, your Honor.

3     And he has asked -- he has promised his wife that he

4  would take her to -- he didn't take her on their Christmas

5  holidays to New York, and they paid for it.  And the Government

6  doesn't have any objection to him going to New York with his

7  wife for that week.  And I would ask the Court for permission to

8  let him go that week.

9     Other than that, he just plans to stay in Florida to do

10  his work as usual.

11     THE COURT:  Very good.

12     MR. COHEN:  Is that all right with your Honor?

13     THE COURT:  Is the Government agreeable with those

14  modifications?

15     MS. PERKINS:  Yes, your Honor, although I don't believe

16  the first one will actually require a modification.  I am

17  unaware of any restriction from him going to his place of

18  business.  But to the extent it does require a modification, we

19  don't have an objection.

20     THE COURT:  That's fine.  The Court will agree to

21  those --

22     MR. COHEN:  Thank you, your Honor.

23     THE COURT:  -- to the extent they are necessary.

24     One other point there, Mr. Cohen, that you indirectly

25  raised.  This next hearing in March -- as I indicated at our

1    last hearing, I am not going to require -- the Defendants are

2    always welcome to be here.  I am not going to require them to be

3    here for that hearing because essentially what we are dealing

4    with here is a myriad of legal issues.  If they want to come,

5    they are welcome to come, but the expense and the

6    inconveniences, especially for people who are far away, to me,

7    outweighs the benefit that they are going to get, and the Court

8    is going to get, from their sitting in this courtroom in the

9    back benches.  So I am not going to require it, but they are

10    always welcome.

11          MR. COHEN:  I understand.

12          THE COURT:  I don't want there to be any doubt about

13    that.

14          MR. COHEN:  I understand, your Honor.  Thank you very

15    much.

16          THE COURT:  Very good.

17          MS. MEDEROS-JACOBS:  Your Honor, Connie Mederos-Jacobs

18    on behalf of Mr. Bigelow.  Mr. Bigelow's business records, bank

19    records, checks, check stubs, statements, bills, reports and

20    invoices have all been the product of -- seized by the

21    Government as a result of the search warrant.  He would like

22    those things returned so he can conduct his business and also

23    file his income taxes.

24          THE COURT:  Those were seized on what date?

25          MS. MEDEROS-JACOBS:  They were seized the date of his

1    arrest, I believe, on the 19th.

2          THE COURT:  Well, as you heard me say just a minute

3    ago, the Government has got to produce the seized records by

4    the 10th, so they are going to get them to you by the 10th, or

5    earlier.  They can do it on a rolling basis, and they can give

6    it to you as fast as they can give it to you.  But that will

7    give you 12 days to review them before we have our next hearing.

8          MS. MEDEROS-JACOBS:  All right.

9          THE COURT:  So hopefully they can get them to you

10   sooner than that.

11         MS. MEDEROS-JACOBS:  If the records are not complete by

12   our hearing date on the 22nd, then the Court would want me to

13   file a Motion to Compel; is that it?

14         THE COURT:  Well, we will see where we are on the 22nd,

15   but obviously if they haven't produced them, in the words of

16   Ricky Ricardo, there will be some 'splaining to do.

17         MS. MEDEROS-JACOBS:  Okay.  Thank you very much, your

18   Honor.

19         THE COURT:  There will be some 'splaining to do.

20         MS. MEDEROS-JACOBS:  I'm Cuban.  I understand that.

21         THE COURT:  You get it.

22         MS. WISENBERG:  Sol Wisenberg on behalf of Michael

23   Sacks, your Honor.

24         THE COURT:  Mr. Wisenberg.

25         MS. WISENBERG:  I seek a clarification on what you said

1    about the warrant materials due by the 10th because some of us

2    have clients who were searched in the UK.  And you said --

3            THE COURT:  The UK is a different situation.  There is

4    a question as to -- there is a legal issue there as to whether

5    or not that which was searched -- first of all, by what

6    authority was it searched?  Was it searched by search warrants

7    authorized by Magistrates and Judges in the UK?  I assume it

8    was.

9            MS. WISENBERG:  I don't even know that yet.

10           THE COURT:  I know I didn't authorize any searches

11   outside of the United States.  I am assuming, as I sit here,

12   that the searches that occurred outside the United States were

13   done pursuant to an order by a Magistrate or a Judge from a

14   foreign nation.  And I don't believe, at least at first blush,

15   that I have any authority to command that a foreign law

16   enforcement authority who did a duly authorized search pursuant

17   to a Magistrate's order be produced to anyone.

18           So I just don't -- right now don't know if there is a

19   sufficient legal basis for me -- and the impression I certainly

20   got from Government counsel was that they haven't even seen the

21   materials.

22           MS. WISENBERG:  I briefly yield the floor, with the

23   Court's permission, to Mr. Onorato.

24           THE COURT:  Mr. Onorato has a comment on that, huh?

25           MR. ONORATO:  Thank you, your Honor.  I do know that

1    there was, first of all, coordination not only between the FBI

2    and the Department of Justice, but the folks in Great Britain.

3    They actually had folks from Great Britain present during the

4    interrogation of my client here in the United States, and they

5    told him at that time that there was going to be search warrants

6    executed in conjunction with what they were doing here in the

7    United States.

8         So I think the situation is a little bit different.

9    And I do think that the Court has the authority to order the

10   Government here to either get the material from the folks in the

11   UK, or it can't be used in any case that they are trying to

12   build against our client, particularly on the quick turnaround,

13   because we would be at a disadvantage if, you know, our

14   deadlines, you know, lapsed way into the future whereas other

15   people are going to get the material, you know, in three weeks.

16   It wouldn't be fair.

17        And, again, the Government put a lot of time and

18   thought into what it did.  So I would respectfully request of

19   the Court either ask the Government to get the material or it's

20   not going to be able to be used.

21        MS. WISENBERG:  And I would just second -- there is no

22   question that there is some kind of coordination between the law

23   enforcement authorities in this case.  My client was informed as

24   well, and there was communication between U.S. and UK law

25   enforcement authorities on that point.  I don't know if you want

1    to speak to that right now or --

2         THE COURT:  No.  My impression was that they are not

3    even -- they, the Government, are not even sure at this point

4    what, if any, of the information seized they have any intention

5    to use whatsoever.

6         Now, obviously they need to determine that.  I mean, if

7    they are going to seek to use it, then they are going to have

8    collateral responsibilities under Rule 16 that they are going to

9    have to comply with.  There is no question about that under the

10   circumstances.

11        So it clearly would behoove the Government to know

12   sooner rather than later whether anything that they obtained

13   through a search warrant abroad is of any value to their case.

14   And I would like to think by the 10th -- it's almost a month --

15   that they could figure out, A, what -- you know, get an

16   inventory of it, review the inventory, and start making some at

17   least preliminary analysis of whether any of it is of any value

18   to the Government's case.

19        If you are intending to use it, then obviously you are

20   going to have to get it shipped here and start producing those

21   portions of it that are producible under Rule 16.

22        So -- maybe I just don't know enough about what the

23   Government has done to date with regard to -- and Mr. Solomon

24   looks like he is going to give me a little update on that, so

25   let me see what he's got to say.

1           MR. SOLOMON:  Well, just a point of clarification.  I

2   thought one of the lawyers for one of the British Defendants

3   told me today that his client had received copies from British

4   authorities of the information that was taken in the search, and

5   I guess that would be useful information for us to have.  We

6   simply don't know.  But if the client knows, then that

7   obviously -- and the client has the materials already, then that

8   seems to obviate the issue for the Court.

9           THE COURT:  Was that in these very cases that

10  Mr. Onorato is talking about, Mr. Wisenberg?

11          MS. WISENBERG:  We have no such information.  I mean,

12  my client hasn't gone back yet, but he tells me they have no

13  such information.

14          And obviously what I am concerned about is a situation

15  where I have seen before where the Government ends up using some

16  information from a foreign source in its case in chief and says,

17  well -- but you don't get the kind of access to it and the Brady

18  and the Giglio and all of that because it's a foreign entity,

19  but they are able to pick and choose.

20          Just flagging that issue for your Honor.  And it's

21  unusual they wouldn't know anything when there was such -- there

22  was clear coordination.  So it is obviously going to be an

23  issue.

24          THE COURT:  All right.  Well, let me put it to you this

25  way.  The Government should take the appropriate steps as soon

1    as possible to determine what, if any, of the seized materials

2    in foreign countries they may need to use in this case and take

3    whatever steps that would be appropriate to have it sent

4    forthwith here so that you can have it reviewed and decide which

5    portions of it must be produced under Rule 16.

6         And by the 22nd, I will need a report on that.  I

7    certainly would urge you to get it resolved prior to the 22nd

8    because, to the extent that these parties are going to be

9    prejudiced by any delay, they are going to get additional time.

10   I mean, you are not ultimately going to get prejudiced by it.

11   You are going to get additional time, if it need be.  If it

12   turns out that they're going to use this stuff, you're going to

13   get extra time for purposes of reviewing it.  You won't be

14   ultimately prejudiced in that regard.  I assure you of that.

15        So it's really in the Government's interest to move

16   expeditiously on this front.  It's a mutual interest, really.

17        And my instincts tell me that the agents who

18   participated -- the FBI agents who apparently participated in

19   these searches abroad not only have it under circumstances where

20   they can gain access to it, but also have either started an

21   inventory or have done an inventory of it.

22        MR. WISENBERG:  And let me just say, your Honor, I

23   don't know if any FBI agents participated in the searches

24   abroad.  All I know is that there is obviously some coordination

25   going on.  I just don't know the answer to that, having just

1    gotten into the case.

2            Did you want to speak to that?

3            MS. PERKINS:  Just for clarification's sake, your

4    Honor, the searches were conducted by UK authorities.  They were

5    not conducted by U.S. authorities.  They were not conducted at

6    the direction of U.S. authorities.

7            THE COURT:  All right.

8            MS. PERKINS:  So the materials were -- like your Honor

9    was alluding to, were seized pursuant to proper UK procedures

10   and not U.S.

11           THE COURT:  All right.  Well, I think you can see that

12   that raises some collateral legal questions, certainly with

13   regard to the reach of this Court's orders.  If the -- if the

14   information seized is -- obviously the information seized was

15   not relied upon in the indictment, because it occurred after the

16   indictment was already obtained, so we know that.  So the

17   Government to date, as far as I know, has not relied upon it in

18   any way with regard to the indictment as to your client.

19           Now, if it's planning on reviewing it and then relying

20   upon it later in the case -- its case in chief against your

21   client, then obviously they are going to have ongoing

22   responsibilities of a Rule 16 nature.  They are going to have

23   ongoing Brady responsibilities that they are going to have to

24   meet as -- as that becomes the case.

25           As of now, they don't -- it sounds to me like they

1    don't even know exactly what's in the materials.  So give some

2    thought to what, if any, assistance perhaps counsel in the UK

3    could provide you, following their procedures and their laws, to

4    gain access to review it, at a minimum, over there.

5              MS. WISENBERG:  I understand.

6              THE COURT:  I am in the dark because I don't have any

7    sense, whereas you might from talking to your client, what

8    possible value this may actually be to your client.  I just

9    don't have any sense of that whatsoever.

10             MS. WISENBERG:  Our primary concern is if the

11   Government starts getting access to this, our position would be,

12   if they get any of it from the UK, they should get everything

13   that was seized, and we should have the same access to it that

14   the Government does.  That's really a triggering event at a

15   minimum.  I mean, I don't know, because I haven't talked to my

16   client enough about it -- there may be other issues later, you

17   know, foreign Brady-type issues, but for now --

18             THE COURT:  Too early to know.

19             MS. WISENBERG:  -- if the Government is going to use

20   it, it's only fair that we should have access to that pool of

21   evidence.  This is -- file this under highly technical or

22   paranoid issue clarification.

23             THE COURT:  Paranormal?

24             MS. WISENBERG:  Not paranormal.

25             THE COURT:  Okay.

1          MS. WISENBERG:  You gave the Government a deadline on

2     their Speedy Trial, whether or not they were going to designate

3     the complex case.  Under that subsection of the Speedy Trial

4     Act, there is also a provision that says even if it's not

5     difficult enough to become complex, you can make a Motion if

6     it's in the interest of justice, talking about various issues,

7     substitution of counsel.  I take it your order is broad enough

8     to cover that as well.

9          THE COURT:  Sure.  If they are going to seek an

10    exemption from the Speedy Trial Act, I need to know it and I

11    need them to file whatever Motion they -- they intend to file

12    consistent therewith.  And you all will have 12 full days to

13    respond to it.

14         MS. WISENBERG:  One point I wanted just your Honor to

15    be aware of, which I forgot to mention earlier, before I just

16    finish up with some bond-related issues, is that, again, in

17    terms of this video evidence that hasn't been turned over but it

18    is being made available in Manassas, I will inform the Court

19    that my client was shown, on computer, one of the videos the day

20    of his arrest by, I believe, an FBI agent.  So it was certainly

21    available in that context and in that format to show to him on

22    an agent's laptop the day of the arrest in Las Vegas.

23         THE COURT:  Well, I am under the impression that all of

24    these are now available for viewing right now, today -- well,

25    not this minute, but --

1    MS. WISENBERG:  1:00 tomorrow, right.

2    THE COURT:  You could go tomorrow --

3    MS. WISENBERG:  And we are.

4    THE COURT:  -- if you could make the necessary

5    arrangements with the bureau out in Manassas, at least as of now

6    it's Manassas, you could go out there and start viewing it --

7    MS. WISENBERG:  Right.

8    THE COURT:  -- I mean, literally tomorrow.

9    MS. WISENBERG:  We have an appointment at 1:00.

10   THE COURT:  Good.

11   MR. WISENBERG:  Finally, on bond, you had said, your

12   Honor -- and I think this is going to be changed because I have

13   talked to Ms. Sucato -- I think the bond conditions originally

14   for my client had him free to travel from Florida, where he is

15   staying with his sister, to D.C. obviously either to attend

16   court --

17   THE COURT:  Sure.

18   MS. WISENBERG:  -- or to --

19   THE COURT:  Meet with counsel.

20   MS. WISENBERG:  Or to meet with counsel.  In my

21   understanding -- I haven't discussed this with the Government,

22   but my understanding is Pretrial Services has no problem with

23   him being free to travel within the U.S. on business as long as

24   he turns his passport in to his Pretrial Services person in

25   Orlando within 24 hours of returning.  And I will tell your

1    Honor that his Pretrial Services officer in Orlando gave him his

2    passport -- he has got his passport now because he couldn't have

3    traveled here without his passport.

4            And so when he went from -- my client went from Las

5    Vegas --

6            THE COURT:  Is he a foreign national?

7            MS. WISENBERG:  Yes, he is from the UK.  When he went

8    from Las Vegas to Florida, when he was released, he checked in

9    with his Pretrial Services officer, he gave him his passport.

10   That officer gave him back his passport in order to be able to

11   travel here today.  And, of course, when he goes back to

12   Florida, he will turn that in.

13           My understanding is Pretrial Services has no problem

14   with him being free to travel on business in the U.S. under the

15   conditions that he turns his passport in when he goes back to

16   Orlando within 24 hours.

17           I haven't spoken to the Government about that.  I don't

18   know their position.  But certainly at a minimum I would want

19   him free to travel between Florida and the whole D.C. area --

20   not just D.C., the D.C. metropolitan area -- including at least

21   as far as Manassas.

22           Do you all have a position on that?

23           MS. PERKINS:  Your Honor, I apologize.  I am not

24   completely knowledgeable about the Defendant's bond conditions,

25   but -- or even totally understand his current request.  Does the

1    Defendant not have alternative forms of ID to travel with, that

2    he needs a passport to travel within the United States?  That's

3    what I'm unclear on, your Honor.

4              THE COURT:  It sounds like it.

5              MS. WISENBERG:  That's true.  Now he is in the process

6    of trying to get, in Florida, either a state ID or a driver's

7    license.  And I anticipate he will have one within a matter of

8    weeks, probably.

9              But I had assumed, perhaps incorrectly, that Ms. Sucato

10   had discussed this with the prosecution.  I guess -- I would

11   request two things:  One, that he obviously continue to be

12   allowed to be given his passport for travel until he gets a

13   State of Florida ID.  We are going to be coming in front of your

14   Honor very shortly asking for him -- permission to travel back

15   and forth to the UK and this country on business, that he is not

16   a flight risk.

17             But for now, my understanding was, at a conversation

18   with Ms. Sucato, that she is going to recommend that he be

19   allowed to travel within the U.S., and that would be fine with

20   us.  And until he gets his state ID, he would have to have a

21   passport.

22             THE COURT:  Well, I will hear from the Government if

23   they have a position on it, but it seems to me it makes sense.

24             MS. PERKINS:  Your Honor, if you give us an opportunity

25   to talk to defense counsel, I think we can work this out amongst

1    ourselves.  I am just slightly unclear about all the specifics

2    here.  So if you would give us a little time, we will talk about

3    it.  We will return to the Court if there is a dispute on this,

4    your Honor.

5              THE COURT:  Let me know in a few days.

6              MS. WISENBERG:  Okay.  I would like to get it -- I

7    mean, he is going to go back the Florida -- at a minimum, he is

8    free -- I take it he is free to travel from Florida to the

9    greater D.C. metropolitan area --

10             THE COURT:  Of course.

11             MS. WISENBERG:  -- including as far as Manassas.

12             THE COURT:  Of course.  He might need to review films

13   with you or something.

14             MS. WISENBERG:  Right.  And until he has some kind of a

15   valid state ID, under the current arrangement where he has his

16   passport and turns it in when he gets back to Florida, your

17   Honor?

18             THE COURT:  You work it out with the Government over

19   the next few days.  You will get it resolved, I am confident.

20             MS. WISENBERG:  Thank you, your Honor.

21             THE COURT:  All right.  Any other housekeeping issues?

22   Are you all set?

23             MS. EVERITT:  This is Tammy Everitt.  I have something

24   to clarify.

25             Good afternoon.  Tammy Everitt with D.C. Pretrial.

1  Your Honor, the reason why Mr. Wares' [sic] employment is an

2  issue is because he works with firearms in Florida, and U.S.

3  Pretrial is, well, to put it nicely, having a fit that he is,

4  you know, employed with the access to firearms.  So that's why

5  they wanted a clear order stating that he was able to maintain

6  his employment at the actual facility that he works at, not just

7  out of his home.

8          THE COURT:  Well --

9          MS. WISENBERG:  Just for the record, he's not my guy.

10 I don't represent Wares.

11         THE COURT:  No, I understand.

12         Why don't you just -- you have Ms. Sucato, or whoever

13 else you need to talk about this with the Government and with

14 the Florida authorities and see if it's resolvable in the next

15 few days.  If not, then come back to me next week and we will

16 work it out.

17         MS. EVERITT:  Thank you, your Honor.  And I do have the

18 two release orders on the Mushriquis, as far as they can travel

19 then.  Those would be the only two modifications now, then.

20         THE COURT:  I will sign those.

21         MS. EVERITT:  Thank you.

22         MS. PERKINS:  Your Honor, I apologize.  With regard to

23 Mr. Wier, we just spoke, and the issue is that Florida Pretrial

24 Services needs an order from you specifically stating that he is

25 allowed to go to the office -- his office, which has firearms in

1   it.  The Government is not opposed to that.  But my

2   understanding is that you need to actually order it in order

3   for --

4          THE COURT:  Work with Mr. Cockrell.  He will make sure

5   the order is in the appropriate format, and I will sign it --

6          MS. PERKINS:  Thank you.

7          THE COURT:  -- as long as there is no objection by

8   Government or by defense counsel.  It's not going to be an

9   issue.

10          MS. PERKINS:  Thank you, your Honor.

11          THE COURT:  Don't worry about it.

12          Mr. Cohen, did you have an issue?

13          MR. COHEN:  Nothing, your Honor.  No.

14          THE COURT:  Did that resolve it?

15          MR. COHEN:  That resolves it.

16          THE COURT:  All right.  We will stand in recess.

17          (Whereupon, at 5:29 p.m., the proceedings were

18   concluded.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2

3

4      I, Patty A. Gels, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8

9

10                          _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25